STATE v. MERRIMAN.

1. DRAWING OF JURIES—BOARD OF JURY COMMISSIONERS—OUTSIDER.—Juries were legally drawn by the jury commissioner and chairman of the county commissioners, in the absence of the auditor, the statute imposing this duty upon the board of jury commissioners to be composed of these three officers, "or a majority of them." Nor was the drawing invalidated by the presence of an acting clerk to the auditor, he taking no part in the proceeding beyond furnishing names from the auditor's books.

2. IBID.—SECRECY OF MEETINGS.—The law prescribes who shall be pres-

ent at the drawing of grand and petit jurors, and the exclusion of all other persons is not prohibited, nor is it improper.

3. COPY OF JURY LISTS.—The board of jury commissioners are not required to furnish a copy of the jury list or to show it to any one who demands it.

4. SELECTION OF JURORS—SECRECY OF BOARD.—The jury commissioners are invested with final power to determine who are suitable persons to be jurors, and they are not bound to disclose their action as to the rejection of persons whose names were drawn.

5. CHALLENGE TO ADDITIONAL JURORS.—It is no ground for challenge to an array of jurors drawn to supply deficiencies, that of the 150 names required by law to be placed in the tales box, two were duplicated, leaving only 148 names in the box—and that three of these persons were excused from jury duty, this being a privilege personal to the jurors if they chose to claim it.

6. IBID.—There cannot be a challenge to an array of jurors drawn to supply deficiencies, as there is no authority for a special venire. The proper practice would be to challenge each particular juror as he is called and presented.

7. EXAMINATION OF JUROR ON VOIR DIRE.—The determination of whether a juror examined on his *voir dire* is indifferent, is exclusively for the Circuit Judge, where it involves only a question of fact.

8. IBID.—Where counsel asked only that a juror be examined on his *voir dire*, it cannot be made a ground of appeal that the juror was not asked whether he was related to either party, no motion to that effect having been presented.

9. EXEMPTION FROM JURY DUTY.—The exemption of a juror from jury duty does not disqualify him from serving, where he does not himself claim such exemption.

10. CONSANGUINITY OF JUROR.—The trial judge did not err in rejecting a juror who was a first cousin of the father of the accused.

11. OBJECTIONS TO JURORS SWORN AND REJECTED.—Objections to jurors considered, the accused having exhausted his peremptory challenges.

12. EVIDENCE—IRRELEVANCY AND HEARSAY.—A witness for the State having testified to following a trail and having stated who were then present, could not properly be asked on his cross-examination who had pointed out the trail and instructed him to pursue it. Such testimony would be irrelevant and hearsay.

13. IBID.—IRRELEVANCY.—Questions asked a witness for the defence on his cross-examination as to a conversation with deceased on Saturday relating to deceased's intentions about cutting trees on land claimed by accused, and whether witness had ever been convicted of larceny, were not irrelevant.

14. IBID.—CROSS-EXAMINATION.—A witness for the defence may be asked

2—34

a question on his cross-examination relating to a declared bias by him towards the deceased.

15. EVIDENCE—IRRELEVANCY.—Irrelevant questions asked are not ground for new trial where the answers could not have affected the verdict.

16. IBID.—EXPERT TESTIMONY—OPINION.—It would seem that one who has attended a course of lectures at a medical college, and has practised medicine for ten years, may be an expert, although never licensed to practise. It is not error to permit such witness to give his opinion as to an undisputed fact.

17. IBID.—EXPERT TESTIMONY—OPINIONS.—There was no error in permitting a regularly licensed practising physician to say that he did not think the body of the deceased had been moved after death and what he thought was the relative position of the gun when discharged, the witness having given his reasons for these opinions.

18. IBID.—CONVERSATION.—After a witness for the State has stated what the accused said to him after the homicide, he may be asked what was his reply.

19. IBID.—LEADING QUESTIONS.—It is not leading to ask a witness whether accused had said where the homicide was or who were present. A leading question is not ground for new trial where witness answered that he did not know.

20. IBID.—IRRELEVANCY.—The acceptance or rejection of irrelevant testimony does not furnish ground for a new trial, unless the trial judge abuses his discretion in this matter.

21. IBID.—TESTIMONY BEFORE CORONER—CASE DISTINGUISHED.—A witness may be asked on his cross-examination as to his statements at the coroner's inquest, he not being now on trial or then accused. This case distinguished from *State* v. *Senn*, 32 S. C., 392.

22. EVIDENCE—CHARACTER OF WITNESS.—A witness for the defence having been examined as to the violent character of the deceased, may be interrogated on his cross-examination as to his own character for violence.

23. IBID.—TESTIMONY AS TO CHARACTER.—A witness to character can testify in chief only as to general character, but on the cross-examination he may be interrogated as to particular acts.

24. IBID.—The competency of questions propounded to a witness, as to statements of the prisoner, need not be considered, when the witness answered that no such statements had been made.

25. IBID.—ACCUSED AS WITNESS.—When the defendant, on trial for murder, takes the witness stand, he may be cross-examined just as other witnesses are. And therefore his character for peaceableness having been previously put in issue by him, he was properly cross-examined as to such character and also as to statements made by him to others relating to such character; and these others were properly permitted in reply to contradict him.

26. SELF-DEFENCE.—The law of self-defence was properly charged in this case.

27. CHARGING ON FACTS.—The charge to the jury in this case was not a charge on the facts.

Before WALLACE, J., Chesterfield, September, 1889.

This was an indictment against William D. Merriman for the murder of Archibald G. Douglass on May 6, 1889.

Jacob Lampley, a witness for the State, having told what the accused (calling him Doc) had said about the homicide, was asked: "Did Doc say anything else when he said in self-defence? What did you say about it?" [Defendant objects to witness stating what he said in reply to what he says defendant said. Objection overruled. Defendant excepts.] "Q. What did you say to Doc? A. I told Doc this: I said if you make it appear in that light, that you have killed him in self-defence, it is more than likely they will not hurt you very bad; but you go to sheriff Douglass and give yourself up to him and tell him all about it." This witness was further examined in chief: "Did Doc tell you where it was, and who was present, if anybody? Objected to on the ground that the question was 'leading.' Objection overruled. Defendant excepts. Q. Did he say anything about where it was or who was present when he did it? A. I don't think he did. Q. Did he say anything about who was present? A. I don't think he told me anybody.    *    *    *"

James Pigg, a witness for defence, was cross-examined as follows: "Q. Isn't it a fact that on Saturday before the killing, you rode a mule over to Archie Douglass's house and called him out to the gate, and asked him when he was going to hack on the disputed land, and he told you on Monday? [Objected to by defendant's counsel. Objection overruled. Exception noted.] A. No, sir."

"Q. Haven't you been convicted of larceny? [Objected to by defendant's counsel. Objection overruled. Exception noted.] Q. Were you tried for stealing and found guilty? A. I don't know that. Q. Don't know whether you were tried or not? A. I don't know. Q. Were you put in jail after the trial? A. I was put in jail. Q. How long did you stay in jail? A. Nine

days. Q. You were charged with stealing what? A. I don't know what I was charged with."

Other matters are sufficiently stated in the opinion. The judge charged the jury as follows:

*Mr. Foreman and Gentlemen of the Jury:* It is admitted by the defence that the deceased was killed by the defendant. Your duty, therefore, will be to find what was the nature of the act. To enable you to do that, the law requires that I shall state to you the legal principles that grow out of any possible view of the testimony. You are to determine the truth of the facts: to decide for yourselves what were the facts that transpired on the day that Douglass was killed, to apply those facts to the legal rules I shall give you, and decide whether the act was murder, manslaughter, or excusable homicide. You will see that your duty is to decide what is the truth of the facts. I tell you what the law is. The law requires that you shall take that from me absolutely. You don't pass on the law. I state the law that you may know what it is, in order that, having determined the facts, you may apply the facts to the law I state to you, and decide what those facts make out. Your finding is not a judgment. The judgment follows upon your finding, whatever that may be.

Now, the defence have submitted several requests to charge, which I shall consider first. They request that I shall charge you:

I. "That if you believe from the evidence that the defendant had reason to apprehend, or did really apprehend, from the previous declarations of the deceased, his attitude at the time, or his being armed with a deadly weapon, that his life was endangered or great bodily harm was threatened, and he fired under the circumstances, his act is excusable." I cannot charge you that, because, in order to make out a case of self-defence, more is required than is stated in that request. What is required I will state to you in a subsequent part of the charge.

II. "That if from all the evidence the jury have reasonable doubts as to any material matter, the defendant is entitled to have it solved in his favor." I charge you that that is the law.

III. "If defendant believed deceased was armed with a deadly weapon and approached him in a manner indicating his inten-

tion to execute a threat of bodily injury or death against him, he was excusable in firing." I do not charge you that because that is another form on the part of the defence of stating what they conceive to be the law of self-defence. In order to make out a case of self defence more is required than that, and I will state it to you further on.

IV. "That uncommunicated threats are admitted to show the animus or motive of the deceased at the time of the homicide, if made a reasonable time before the fact." I charge you that.

V. "That communicated threats besides being evidence of the animus of the deceased are admitted to show the ground of fear and apprehension of the attack by the deceased according to the threats, and justify the defendant in preparing to resist the attack according to the character of the threats." I so charge you. That is, that communicated threats will justify the defendant in preparing to resist an attack, because preparing to resist an attack is not criminal.

VI. "If conviction is sought upon evidence in whole or in part circumstantial, the circumstances must be consistent with each other, and consistent with the hypothesis of guilt and inconsistent with the innocence of the defendant, and incapable of explanation upon any other hypothesis before the defendant can be convicted on such evidence." I charge you that, and I will try to state a little more fully hereafter.

VII. "That such evidence should be received with the utmost caution and the prisoner must have the benefit of every reasonable doubt in every stage of the investigation in this case." I charge you that.

And now, before I explain to you the different degrees of homicide in this State, I will say a word to you in regard to evidence. A very general division of evidence is into positive evidence, and what is sometimes called circumstantial evidence. We have had an illustration of both kinds in this trial. Positive evidence is given by a person who goes on the stand and states a fact in regard to the fact in issue, as of his own knowledge. Now what is the issue in this trial? It is whether the defendant is guilty of a crime or not. If a man saw the circumstances right then which would go to convict him of the crime, or acquit him

of the crime, right there attending the act, that is positive evidence. He saw it during the occurrence of the event. If, on the other hand, he did not see the transaction and could not testify as to the fact in issue, but testified to the circumstances in his knowledge that related to the question in issue, that is circumstantial evidence : because, though he does not speak himself, he produces circumstances which he asks to speak. You are to interpret the circumstances, and ascertain and determine their significance, and decide whether they affect the issue or not. Now, whenever circumstances are submitted to you, you are to decide upon their significance. In other words, you are to determine what those circumstances say ; what testimony they give. And when those circumstances are submitted to you, that is called circumstantial evidence—the evidence of circumstances. Circumstantial evidence and the evidence of circumstances are convertible terms.

Now, you will see that both kinds are competent and legal. If one sort satisfies the mind of a jury, it is just as sufficient and competent to support a verdict as any other kind. I cannot tell you that one sort is stronger than the other. That sort is strongest with the jury that produces conviction on the mind of the jurors, and that is the only test. I cannot charge you that the unquestioned testimony of witnesses who deliver personal testimony is any better than the testimony of circumstances ; because, as I have explained to you, circumstantial testimony is when a circumstance is made a witness. It is said, and I have been requested to charge you, that when circumstantial testimony is delivered to a jury for the purpose of satisfying the mind of a jury as to the guilt of the defendant, all the circumstances must be consistent with the guilt of the accused, and inconsistent with his innocence. That is true. It is a rule by which you are to measure the force of the testimony. The rule is not that each witness that testifies to facts must be consistent with every other witness, but each circumstance that is established according to your satisfaction must be consistent with every other circumstance that is established to your satisfaction. It is the proof that must be consistent, not the witnesses, necessarily.

It was stated to you in the argument that circumstantial testi-

mony was unreliable, because the law books are full of instances in which defendants have been convicted of crimes charged against them upon circumstantial testimony, and it was subsequently discovered that the conviction was erroneous.    I think counsel will agree with me that there are a number of cases of that kind; but generally, the question was not as to the nature of the act of the defendant, but as to whether the right man had been laid hold of by the officers of the law.    It was where the question of identity was made whether the right man was accused and being tried, and not, as I have already said, where the question related to the nature of the act, that act having been admitted by the defendant.    So I do not know that I need say anything more to you about the nature of the evidence that has been submitted to you. By way of illustration I will say : You will remember there were witnesses put up by the defence who testified to what occurred on the day of the killing.    They testified as to what they saw.    That is positive testimony.    There were other witnesses that testified to circumstances, as to facts that they observed after the main transaction was past—as to the position of the tree, the material that was alleged to be wadding, the bushes and the trampling, the trail, and all that sort of things, circumstances that were testified to by witnesses, and if you believe they tell the truth, then those circumstances are converted into witnesses, and you will determine what their significance amounts to.

Now, gentlemen, is the defendant guilty of murder ?    You have got to answer that question.    To enable you to do it you must know what murder is, and after you know what murder is, then you ascertain the truth of the facts from the testimony that has been submitted to you, and see if a case of murder has been made out.    Murder in its briefest description is the killing of a human being with malice aforethought, express or implied.    In other words, the killing of a human being with malice.    What is malice ?    The general definition of malice is evil intent.    If one man intends to kill another man without legal provocation or reasonable excuse, and does kill him, why, he is guilty of murder.    If one man lies in wait for another to come by his way, to come in reach of his weapon, intending to kill him, and he does meet and does kill him, that, of course, is murder ; because

malice is evidenced by the lying in wait. That is express malice—lying in wait. It is alleged here that this is what this defendant did. You are to say whether he did or not. You know the law absolutely prevents me from expressing any opinion on the testimony at all. The jury must decide that question absolutely unhampered or uninfluenced by any suggestion of the judge.

Did this man do that? If you are satisfied of that beyond a reasonable doubt, then there can be only one verdict. If you are not satisfied of it beyond a reasonable doubt, then you inquire further and say, if it was not murder, if you conclude this was not murder, then what was it? The defendant says that he did it in self-defence. You need only inquire whether he did it in self-defence, if you determine that the case is not murder. If you should decide that it was a case of murder, from the law and the testimony, then you stop right there and render your verdict; and in that case your verdict will be simply guilty. Guilty would relate to the charge in the indictment, and the charge is murder. You remember the testimony, without referring to it myself at all. I don't think there is any occasion that I should do so. You are in full possession of all of it. I make the remark right here that this has been the most painstaking criminal trial I ever witnessed. Extraordinary pains have been taken on both sides, that the jury should be put in possession of all attainable facts on both sides. But you know the testimony that has been submitted in support of the theory that the defendant killed the deceased in self-defence.

What does the defendant have to show in order to entitle him to a verdict of not guilty? Our own court have made as clear an exposition as to what constitutes self-defence, as has been written in the law books for one hundred and fifty years, and it is really the summing up of the best authority on that subject that I know of in existence. They say, to constitute a case of self-defence in the first place the defendant must be without fault on his own part—that is, he must have no malice. He must be without fault on his own part. Then he must find himself in a condition of circumstances, and without fault on his part, that induces him to believe that he is in danger of being killed or sustaining great bodily harm. He must believe that, and he must

satisfy you that he believes that, and then he must go a step further. The jury must be satisfied from the testimony that a man of ordinary firmness would have believed that, situated as the defendant was. You must judge him from his standpoint. You must look at the condition of the circumstances from the position from which he looked. You must see from his point of view. In this case, were the circumstances such that without fault on the part of the defendant he found himself involved in a condition of circumstances in which he believed that he was in danger of being killed or sustaining great bodily harm, and do you believe from his standpoint that he was justified in that belief? If all those things concur, he is entitled to an acquittal. If they do not concur, he is not entitled to an acquittal. You are to say.

In order to explain this matter a little more fully to you, suppose this defendant had gone into the woods that day for the purpose of killing the deceased, and he showed himself to the deceased, expecting that the passions of the deceased would be inflamed by seeing him there, and a combat would ensue and he would kill him. I suppose that by way of illustration; of course, I don't say that is the truth of the facts. I don't say anything about the truth of the facts. Suppose that was the truth of the facts. That would be murder, no matter how much endangered the life of the defendant might be under those circumstances; if he killed, it would be murder. Why? Because he had malice in his heart. He went there intending to kill him, expecting a condition of circumstances to be brought about that would enable him to do it, that upon the face would give it the appearance of self-defence. There is no self-defence where there is malice.

But if he went there on a peaceable errand, not expecting or anticipating any trouble, and unexpectedly an attack was made on him, then all his rights of self-defence existed. Another illustration: Suppose he went there to offer an arbitration, on a peaceful errand, and to his surprise the defendant undertook to assault him. Could he get away without killing him? If he could, no matter what the defendant did, it is not self-defence; because self-defence only exists where the defendant is without fault and it is necessary for him to kill his assailant or disable him in

order to save his own life; and therefore, if he could get away without killing, if it was not necessary to save his own life that he should kill him, it was not self-defence, nor would it be murder, but it would be manslaughter.

Manslaughter in the books is defined to be the felonious killing of a human being without malice, in sudden heat and passion, and upon legal provocation. It is not every time that a man kills another in sudden heat and passion that it is manslaughter, but only when it is done on legal provocation; only when there is sudden heat and passion produced by such causes as the law allows to be adequate to produce a degree of tumult in which the malicious intent cannot be consciously formed. And so if a man is attacked by another, unexpectedly, an assault committed upon him, or an assault and battery, and in a sudden flame of passion he kills him, that is not malicious, that is sudden heat and passion. To illustrate: 'If one of you were walking along the streets and you met a stranger, and he pushes you off the sidewalk, and you pull out your knife and stick it in him and kill him, you will see that is not self-defence, because there is nothing to indicate that you were in danger of life or great bodily harm; it is not murder, because you did it under sudden heat and passion, and under legal provocation—an assault and battery has been committed on you, or if he offers to strike you, or push you over, it is an assault. In the case supposed, if the defendant went into the woods on a peaceful errand and the deceased in a sudden flame of anger, when he saw him, commits an assault on him, and he fires, there is no malice, if he could get away, there is no malice; it is done in sudden heat and passion, and it is manslaughter.

So now, I think you understand the degrees of homicide, and as soon as you find what the facts of the case are—because that is the question the law refers to you—then you will be able to say by your verdict whether the act of the defendant was murder, manslaughter, or excusable homicide—self-defence. The jury never passes on any question but the question of fact, except in the case of libel. The judge must decide the law, that is his business; because, if he is in error, there is a Supreme Court in Columbia to put him right. If the jury makes a mistake on a

question of fact, then the presiding judge can put them right, but the Supreme Court in Columbia cannot. You are to decide the question of fact. You are not to decide any question of law. You take the law from me; I will tell you what it is, and you decide the truth of the facts.

Murder is the killing of a human being in malice. If the facts in this case make out a killing in malice, it is murder. If not murder, do the truth of the facts make out manslaughter, the killing in sudden heat and passion on legal provocation? Or do they make out a case of self defence, as I have explained it to you? Always the benefit of every reasonable doubt the defendant is entitled to, and that is the reason that whenever a defendant comes into court, he comes under the legal presumption of his innocence. And that is a reasonable rule. Look at this crowd assembled here. How few are guilty of any crime. This is a heavy criminal court, but how few men are charged with it in comparison with the great number that constitute Chesterfield County. The overwhelming weight of presumption is against the commission of crime, therefore every man is presumed to be innocent. So few commit crime relatively, that when a man is charged, the burden is on the prosecution to prove him guilty beyond a reasonable doubt. When that is done, of course all presumptions of innocence fade out of the case; but until that is done, he is entitled to stand on his rights and say, prove me guilty.

But in a case of homicide, when the killing is proved and no more, it is murder; because the law implies malice, and attaches it to every killing, when the killing is proved, and no more. If the defendant had come into court and admitted that he killed the deceased and no more was put in the case, you would have been obliged to say guilty; but when the facts and circumstances of the case are all put in before you, then all implications of malice fade out of the case, and the jury must decide on the facts presented to you whether the killing was malicious or not. For malice is like any other fact, to be proven either expressly or by inference from the testimony. If you find the defendant guilty, just say guilty on the back of the indictment; if you find him not guilty of murder but guilty of manslaughter, say guilty of

manslaughter; if you find him not guilty of murder nor of manslaughter, say not guilty.

*Messrs. Hough & Kennedy, Prince & Stevenson,* for appellant.

*Mr. Johnson,* solicitor, contra.

January 20, 1891. The opinion of the court was delivered by

MR. JUSTICE McIVER.   The appellant was indicted for and convicted of the murder of one A. G. Douglass, and judgment having been rendered in accordance with the verdict, he now appeals to this court upon various grounds set out in the record. These grounds are so numerous—sixty-one in number—and many of them being mere repetitions, in different phraseology, of the same positions, it is not necessary to consider them *seriatim.* We propose, therefore, to confine ourselves to the several positions, as stated in the argument of counsel for appellant, relied on to sustain this appeal, as they in fact really embrace all the points presented by the grounds of appeal.

The first point raises the question as to whether there was error in overruling the challenges to the array of both the grand and petit juries.   It seems that the case was first called for trial before his honor, Judge Norton, when the counsel for the defence challenged the array of the grand and petit juries, upon grounds which will hereinafter be stated, and these challenges were overruled, whereupon the case was continued. When the case was called for trial at the next term, before his honor, Judge Wallace, the defendant renewed his challenge to the array of the grand jury, on the same grounds presented to Judge Norton, and also challenged the array of the petit jury upon grounds which will hereinafter be stated, which were practically the same as those presented to Judge Norton.   The ruling of Judge Wallace is stated in the "Case" in these words: "That as the same questions had been presented for the consideration of Judge Norton at the preceding term, and that as Judge Norton had ruled upon them, he would not disturb that ruling."

Before proceeding to consider the validity of the challenges to the array of the grand and petit juries, we will dispose of a point

raised by one or more of the exceptions, imputing error to Judge
Wallace in holding that he was bound by the previous ruling of
Judge Norton.    We do not understand that Judge Wallace held
that he was bound by the previous ruling of Judge Norton ; and
for this reason we have set out *in haec verba* the ruling of Judge
Wallace as it appears in the "Case."    He did not say that he
*could* not disturb the ruling of Judge Norton, but that he *would*
not do so, and therefore it is not correct to say that Judge Wal-
lace ruled that he had no power to review or reverse the previous
ruling of Judge Norton, but all that his language warrants is that
he did not feel disposed to do so.    What was his reason is not
stated ; whether it was because he thought Judge Norton's rul-
ing right, or whether because he felt bound by it, we have no
right to conjecture. ·  But after all the real question is as to the
correctness of the ruling ; and it is wholly immaterial to inquire
into his reasons for making it.

The grounds upon which the challenge to the array of the
grand jury rest are substantially as follows : 1st.  Because all the
members of the board of jury commissioners were not present at
the time the jury list was prepared and at the time the grand
jury which found this bill was drawn, but only the jury commis-
sioner and the chairman of the board of county commissioners,
together with one D. M. Barrentine, who it seems was in the
habit of acting as the clerk or deputy of the county auditor,
were present, the county auditor himself not being present. 2nd.
Because the grand jury was not drawn openly and publicly, but
was drawn in the clerk's office with locked and closed doors,
whereby the public was deprived of the right to be present and
witness the drawing.    3rd.  Because when the defendant by his
attorneys applied to the jury commissioner for an inspection of
the jury list and a copy of the same, the application was refused.
The grounds of the challenge to the array of the petit jury were ·
the same as the first two above stated, and in addition thereto
the following : 3rd.  Because the attorneys for defendant were
denied the privilege of being present and witnessing the drawing
of the jury.    4th.  Because after the jury was drawn the jury
commissioners declined to answer the inquiry of the attorneys
for defendant, as to whether any of the names drawn were

rejected. The return of the jury commissioners substantially admitted all the facts upon which the challenges were based, but stated that although Barrentine was present, he did not participate either in preparing the list or in the drawing, further than to furnish the names of persons liable to jury duty from the auditor's books. They also admitted that one person whose name was drawn was rejected, because his habits were such as to unfit him for jury duty ; and they justified their course in locking the doors of the clerk's office while drawing the jury, by advice of the former solicitor to that effect.

The first question to be considered is whether the fact that one of the three members of the board of jury commissioners was not present affords any sufficient ground for sustaining the challenge to the array. This question is · disposed of by the express terms of the statute. *Section 2234 of General Statutes, after providing for the appointment of a jury commissioner, declares that he, . "with the county auditor and chairman of the board of county commissioners, *or a majority of the same*, shall constitute a board of jury commissioners," &c. It is very plain, therefore, that any two of those officers may perform any of the duties of the board. The fact that Barrentine was present cannot affect the question, as he did not participate in the preparation of the list or drawing further than to furnish the names from the auditor's books, which seem to have been in his possession and under his control.

The fact that the jury was not drawn "openly and publicly" is not sufficient to sustain the challenge, for we are not aware of any statute which requires this to be done. Formerly the law did require juries to be drawn in open court, under the supervision of the presiding judge, which necessarily involved the idea of publicity ; but that is not now the law. On the contrary, section 2248 of the General Statutes simply provides that jurors shall be drawn "in the presence of the clerk of the court and the sheriff of the county," and when those are present, as they appear to have been in this case, we see no warrant for saying that the exclusion of the general public will vitiate the panel. Indeed, since the present law requires that the board of jury commissioners shall exclude from the list persons who are not, in their

judgment, qualified to perform the high and responsible duty of jurors, or who are not of "good moral character" and "sound judgment," which was not the case formerly, there may have been a good reason for omitting from the present statute everything which involved the idea that this important duty should be performed publicly ; especially as the statute requires that the drawing should be in the presence of the clerk and sheriff, two trusted officials, who might be regarded as sufficiently representing the general public, for they are not members of the board, but are simply required to be present. If the public generally were entitled to be present, it might greatly embarrass the board of jury commissioners in canvassing the fitness of any person whose name might be drawn ; and that seems to have been one of the reasons assigned for excluding the public upon this occasion, At all events, not having been cited to any law which requires publicity, we cannot undertake to say that there was any error in this respect.

So, too, as to the 3rd ground. We are not aware of any law which requires the jury commissioners either to furnish a copy of the jury list or submit it for the inspection of any person who chooses to ask for it.

This disposes of all the grounds upon which the challenge to the array of the grand jury rests, as well as the first two upon which the challenge to the array of the petit jury is based. The third ground is disposed of by what we have said above in regard to the alleged necessity for publicity. There is no law, so far as we are informed, which gives either party to a cause, or his attorney, the right to be present and witness the drawing of the jury, and hence there was no error in denying such alleged right.

So, too, as to the fourth ground upon which the challenge to the array of the petit jury was rested. There is no law which requires the jury commissioners to give information as to who they have rejected as jurors, and it might be prejudicial to the interests of justice to require them to do so. At all events, these officers have been invested with the power to determine finally, without appeal, whether a given person is a suitable person to be a juror, and hence we see no reason why they should be required to disclose their action in a matter of

such delicacy. As public officers they are supposed to enjoy the confidence of the public, and their action is and perhaps ought to be final.

The second question presented by appellant's counsel is whether there was error in overruling his challenge to the special venire. It seems that when the challenges to the array were over-ruled, the solicitor moved that a special venire be issued to fill up the panel, as several of the thirty-six originally drawn were either absent or excused. This order was granted, and the requisite number having been drawn and summoned, the defendant challenged the array so drawn upon two grounds, substantially as follows: 1st. Because there were in fact only one hundred and forty-eight names placed in the tales box, while the law required that there should be one hundred and fifty. 2nd. Because three of the persons whose names were found in that box were exempt from jury duty. This challenge was likewise over-ruled. We do not think that either of these grounds can be sustained. It is true that section 2237 (Gen. Stat.), as amended by the act of 1886 (19 Stat., 599), does require the jury commissioners to place in the tales box "the names of one hundred and fifty persons qualified by law to serve as jurors, who reside within seven miles from the court house, from which shall be drawn jurors to supply deficiencies arising from any cause or emergency during the sitting of the court;" but there is no provision that the failure to comply literally with this requirement will invalidate a panel composed in part of persons drawn from the tales box. It seems that in this instance the board of jury commissioners intended to comply literally with the law, for there were one hundred and fifty slips of paper with names written thereon placed in the box, but it happened that, by inadvertence probably, the names of two of those persons appeared on two slips of paper, so that in fact only the names of one hundred and forty-eight persons were in the box. We do not think, therefore, that the first ground upon which the challenge rested can be sustained.

Nor can the second ground be sustained for the same reason, and for the additional reason that while the persons named may have been exempt from jury duty, it does not appear that they were not "qualified by law to serve as jurors." Their exemp-

tion was a personal privilege which they might or might not claim, but it did not disqualify them as jurors.

But in addition to this, "inasmuch as there was not only no necessity, but also no authority," for issuing a writ of venire to summon the additional jurors drawn from the tales box, as was held in *State* v. *Hill* (19 S. C., 435), we do not see any basis for the challenge to the array. It seems to us that the objection should more properly be made when any juror whose name had been drawn from the tales box was presented; and it does not appear from the record before us that any such juror was presented to the prisoner in this case. In no view of the case, then, could this challenge have been sustained.

The third and fourth questions may be considered together, as they both involve the propriety of the ruling of the Circuit Judge as to the competency of certain jurors examined upon their *voir dire*. The question whether a juror examined upon his *voir dire* appears to the court to be indifferent, is a question addressed exclusively to the Circuit Court, where, as in this case, it involves a mere matter of fact. By the express terms of the statute it is for that court to determine whether the facts disclosed by such examination are such as would render a juror indifferent or otherwise; and this has been repeatedly held by this court. *State* v. *Williams*, 31 S. C., 257, and the cases there cited.

The complaint that the Circuit Judge failed to ask certain jurors examined on their *voir dire* whether they were related to the deceased is not well founded. The statute provides that the court shall, *on motion of either party*, examine a juror as to whether he is related to either party, &c., and if no motion was made to the court to examine a given juror as to whether he was related to the deceased (and there was no such motion in this case), the omission to ask such question cannot be assigned as error.

The fact that one of the jurors presented to the prisoner was exempt from jury duty, furnished no ground of exception. The exemption is a privilege personal to the juror, and may or may not be claimed as he may desire. It certainly does not disqualify him from jury duty.

3—34

The objection that the judge erred in rejecting the juror Fletcher because of his relationship to the accused within the degrees stated in the record, cannot be sustained. We are not aware of any statute fixing the degrees either of consanguinity or affinity within which a juror is disqualified; and it must therefore be left to the Circuit Judge to determine whether the fact that the juror's father and the grandfather of the accused were brothers, was such a relationship as would be likely to render the juror not indifferent in this case. And we think that the Circuit Judge was fully justified in his ruling by the analogy drawn from the case of *State* v. *McQuaige* (5 S. C., 429), as well as the act of 1887 (19 Stat., 851), declaring the degrees of affinity or consanguinity within which a judicial officer should be disqualified. To avoid misapprehension, we desire to state that although the "Case" as prepared for argument here did not show that the appellant had exhausted his peremptory challenges, yet the solicitor at the hearing very properly admitted that such was the fact, and hence it was necessary for us to consider the several objections to the jurors.

We will next proceed to consider the several objections to the competency of the testimony. The witness, A. J. Smith, after having testified in behalf of the State as to having followed what seemed to be a trail (as he termed it) from the place where the dead body was found to the bushes behind which, as the prosecution alleged, the prisoner stood when he fired the fatal shot, was asked first on the cross-examination who were present at the time, and he gave the names of several persons. He was then asked: "Who instructed you to look up the trails and tracks and so forth?" and also, "Who pointed out to you the trail?" to both of which questions the solicitor objected and the objection was sustained. We do not see any error of law in this. These questions seem to have been irrelevant, and in answering them the witness would have to speak from hearsay. If counsel deemed it important to prove who directed the witness to look up the trail and who pointed it out to him, having been furnished with the names of the persons who were present, he could have examined them, and not ask the witness to say what others had told him.

The objection to the questions propounded to James Pigg, a witness for the defence, on his cross-examination cannot be sustained. We understand the rule to be that a witness on his cross examination may be asked questions which, though irrelevant to the issue on trial, may yet tend to discredit him before the jury, the qualification being that the witness may decline to answer, and that if he does answer, his answer must be accepted and cannot be contradicted by other witnesses. 1 *Greenl. Evid.*, §§ 446, 449. We do not think that there was any error in permitting the solicitor to ask this witness on his cross-examination whether he had ever been convicted of larceny.

The objection to the competency of certain questions asked Elisha McDugald, a witness for the defence, on his cross-examination, was not well taken. He was asked whether he had not said to one Jack Smith that the deceased could be better spared than any other man in the community, and the question was ruled competent, upon the ground that its purpose was to show bias in the mind of the witness against the deceased. This ruling is sustained by the following statement of the rule in this respect in 1 Greenleaf on Evidence, section 446, where, in speaking of the use and value of a cross-examination, that writer says : "By means of it the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination and prejudices, &c., * * are all fully investigated and ascertained and submitted to the consideration of the jury, before whom he has testified, and who have thus had an opportunity of observing his demeanor and determining the just weight and value of his testimony."

It is very obvious that the exceptions to the testimony of J. C. Coker are unfounded, if for no other reason, because the questions objected to were answered in the negative, and hence could have no effect either one way or the other. So, too, as to the objection to the testimony of J. E. Bone elicited on cross-examination. While it seems to have been irrelevant, we are unable to discover any ground upon which it can be regarded as incompetent. Another witness for the defence, Hugh Brown, was asked on cross-examination whether he had not told

Jack Freeman that when he heard the report of the guns that he knew that the deceased, Douglass, was dead, which question was objected to and the objection was overruled.  But as the answer was a denial that he had said so to Freeman, we do not see the necessity of considering the matter further.

We do not think there is anything in the exception based upon the refusal of the court of defendant's motion to strike out the testimony of A. T. Kelly, upon the ground that it appeared from his cross-examination that he "was not a licensed physician, and not an expert."  But it also appeared that this witness had taken a course of lectures at a college (medical, we presume), and had been a practising physician for about ten years.  It does not seem to us that it will do to say that such a person is not an expert, simply because he has not been regularly licensed to practise medicine.  But waiving this, his testimony was wholly immaterial—in fact, amounted to nothing whatever, except that he said, what was an undisputed fact, fully proved by another witness, who was beyond all question an expert, that in his opinion the wounds found upon the body of deceased would produce instant death.

The objection to the testimony of Dr. Redfearn is that he was allowed to give an opinion in respect to matters as to which he was not an expert.  The first question objected to was whether in his opinion the body of the deceased had been in a different position from that in which he found it, and had been moved to that position.  The solicitor said to the Court : "I want him to state, as his medical opinion, whether that body was moved after the hemorrhage, from the appearance of the blood inside the chest."  The Court then framed the question in the following language : "Can you tell that, doctor, from the quantity of blood in the chest?"  To this the witness answered : "I think if the body had been moved, it is likely there would have been some hemorrhage at the mouth and nose," and then proceeded to give his reasons for such opinion, based upon the condition in which he found the lungs and bronchial tubes, &c. It is very obvious from this statement that the witness was called upon to give and did give his opinion as a medical expert, stating the facts which his examination of the body revealed, upon which

his opinion was based.    We do not see how it is possible to doubt that such testimony was competent.

The next question objected to was designed to elicit from the witness his opinion as to the position in which the gun must have been to produce the wounds found on the body.    The Court, after instructing the witness first to state ths facts upon which he based his opinion, and then give his opinion, overruled the objection.    The witness, who was called on to make the *post mortem*, seems to have made a very intelligent and careful examination, and proceeded to state the facts which such examination revealed, and then the opinion which he had framed from such facts, to the effect that the muzzle of the gun must have been higher than the man who was shot.    This, it seems to us, was clearly competent.    See *Seibles* v. *Blackwell*, 1 McMull., 56; *Jones* v. *Fuller*, 19 S. C., 66.

The first question propounded to the witness Lampley, which was objected to, was clearly competent, as its purpose was simply to bring out the whole of the conversation between the witness and the prisoner shortly after the homicide was committed; and the second question to that witness, even if it could be regarded as a leading question, as we do not think it could, was unobjectionable, because the answer was that the prisoner did not say anything about the matter inquired about.

We do not see that there was any error of law in admitting the testimony of Nancy Douglass.    The only objection urged to that testimony seems to be that it was irrelevant, and it certainly was not incompetent.    The matter of receiving or rejecting irrelevant testimony must necessarily be left largely to the discretion of the Circuit Judge, and we do not think that the Circuit Judge abused his discretion in this instance.

The objection to the question propounded to B. M. Merriman, a brother of the prisoner and a witness for him, on his cross-examination, cannot be sustained.    This witness was not on trial, and no prosecution was then pending against him.    He was examined as any other witness, and it was clearly competent to. ask him what he had said when examined as a witness before the coroner's inquest, when it does not appear

that he was under arrest. The case of *State* v. *Senn* (32 S. C., 392) is not applicable, for there the effort was to bring out *from the accused* what he had said when examined as a witness before the coroner's inquest. But in addition to this, the testimony elicited from this witness by these alleged objectionable questions seems better calculated to benefit rather than to injure the defendant.

M. C. T. Odom was examined as a witness on the part of the defence to prove the violent character of the deceased, as well as the peaceable character of the prisoner, and when asked on his cross-examination, "How is it with yourself about violence?" the question was objected to and the objection was overruled. In this there was no error of law. The manifest object of the cross-examination was to test the value of this witness's testimony, by showing that his own character in the respect inquired about was not exactly such as would be likely to enable him to give to the jury a correct estimate of the character of the deceased for violence; and this, under the rule laid down in 1 Greenl. Evid., § 446, quoted above, was clearly within the limits of a cross examination.

W. H. Goodale was also examined as a witness for the defence to prove the peaceable character of the prisoner, and when on his cross-examination he was asked whether he had ever heard of his being charged with an attempt to do violence to one Gardner, objection was interposed, on the ground that in attacking or defending one's character, the testimony must be confined to the *general* reputation, and evidence as to *particular* acts is inadmissible. There can be no doubt that when a witness is put upon the stand to attack or defend character, he can only be asked on the examination in chief as to the general character of the person whose character is in question, and he will not be permitted to testify to particular facts, either favorable or unfavorable to such person; but when the witness is subjected to cross-examination, he may then be asked, with a view to test the value of his testimony, as to particular facts. In the eye of the law the character of a person is to be ascertained by an inquiry as to what is generally said or thought of him in the community where he resides. Hence when a witness has testified on his examina-

tion in chief that the person, as to whose character the inquiry
is instituted, bears a good character, his opinion and the value of
it may be tested by asking the witness on his cross-examination
whether he has ever heard that the person, whose character is in
question, has been accused of doing acts wholly inconsistent with
the character which he has attributed to him.    This, according
to our experience, has always been allowed on a cross-examina-
tion without question.    So far as we are informed, there is no
distinct adjudication of this precise point in this State, and the
authorities elsewhere seem to be conflicting, as may be seen by
reference to 3 Am. & Eng. Encycl. Law, 116, and the cases
there cited, but we think the better view is that herein adopted,
and is in accordance with the practice in this State.

Whether the questions propounded to the witness, S. F. Ham-
mond, on his cross examination were properly allowed, need not
be considered, for these questions being designed to elicit
certain statements of the prisoner made to the witness in
regard to his alleged difficulty with Gardner, and the wit-
ness having said that no such statements were ever made to him,
it is wholly immaterial to inquire whether there was any error in
overruling the objections to such questions.

We now come to the consideration of the objections presented
to certain questions propounded to the prisoner while on the
stand as a witness in his cross-examination.    In answer
to the first objection, that there was error in allowing the
defendant upon his cross-examination to be interrogated
upon anything besides the facts and circumstances of the case, it
is sufficient to cite the case of *State* v. *Robertson* (26 S. C., 117),
followed by the very recent case of *State* v. *Wyse* (33 *Id.*,
582), holding that when a defendant avails himself of the privi-
lege of testifying as a witness in his own behalf, he assumes the
position of an ordinary witness and may be treated as such.    It
will be observed that the prisoner was not examined as a witness
until after he had put his character in issue, and hence, for the
reasons above indicated, we do not think there was any error in
allowing him to be asked whether he had not previously commit-
ted or attempted to commit other acts of violence similar to that
for which he was on trial.    So, too, the objection to the ques-

tions propounded to the defendant on his cross-examination, as to whether he had ever told Hunt, Huggins, and Cassidy that if John Odom had not come up when he did, he would have shot Gardner, cannot be sustained. The prisoner having chosen to put his character for peaceableness in issue, with a view to create a presumption that he was not capable of committing such an act of violence as that for which he was then on trial, his real character thereby became a material inquiry, and hence it was permissible to ask him these questions with a view of contradicting him by the witnesses named, which was properly permitted when the State came to reply in evidence. Of course, if the prisoner had been asked while he was on the stand whether he had told these witnesses that he had committed larceny, or forgery, or some other such crime, and he had denied it, the State could not have been permitted in the reply to offer these witnesses to contradict him ; for whether he had committed larceny or forgery would be wholly immaterial to any issue involved in the case then on trial, and therefore under the well settled rule, recently considered in *State* v. *Wyse*, 33 S. C., 582, it would not be competent to offer evidence tending to contradict a statement wholly collateral and immaterial to any issue involved in the case then on trial.

It only remains to consider the exceptions to the judge's charge, which may be reduced to two general heads : 1st. That there was error in the instructions given to the jury as to the law of self-defence. 2nd. That the judge charged on the facts in violation of the constitutional provision on that subject. Inasmuch as we have so recently had occasion, in the case of *State* v. *Wyse, supra*, to give our views as to the law of self-defence, we do not deem it necessary to repeat them here. We are satisfied that when the judge's charge, which should be incorporated in the report of this case, is read in connection with Wyse's case, it will be too plain for argument that the law on that subject was fully, clearly, and correctly given to the jury in this case.

As to the allegation that the Circuit Judge violated the constitution in charging on the facts, we think it is only necessary to read the charge to see that this assignment of error is utterly without foundation. Neither in the ex-

ceptions nor in the argument has any specific portion of the charge been pointed out as sustaining this ground; and a careful examination of it has failed to disclose a single instance in which the constitutional provision has been violated, or in any way infringed.

The judgment of this court is, that the judgment of the Circuit Court be affirmed, and that the case be remanded to the Circuit Court, in order that a new day may be assigned for the execution of the sentence heretofore imposed.