## SPALITTO v. UNITED STATES.
### No. 8698.

Circuit Court of Appeals, Eighth Circuit.
March 14, 1930.

Frank D. Rader and John N. Swenson, both of Kansas City, Mo., for appellant.

Harry L. Thomas, Asst. U. S. Atty., of Kansas City, Mo. (William L. Vandeventer, U. S. Atty., of Kansas City, Mo., on the brief), for appellee.

Before VAN VALKENBURGH and GARDNER, Circuit Judges, and MUNGER, District Judge.

GARDNER, Circuit Judge.

Appellant was convicted on three counts of an indictment charging him with engaging in the business of a distiller and of carrying on and operating a distillery in violation of law, and with having on his premises a quantity of mash fit for distillation purposes. Count 2 charges that on the 12th day of September, 1928, at 1142 Independence avenue, in Kansas City, Jackson county, Mo., the defendant operated a distillery for the purpose of distilling alcoholic spirits with intent to defraud the United States of America of the tax on the spirits distilled by him. Count 3 charges that at the same time and place the defendant operated a distillery for the purpose of distilling alcoholic spirits, without having given a bond as required by

law; while count 4 charges that at the same time and place the defendant unlawfully and feloniously made and had possession of a quantity of mash fit for distillation and for the production of alcoholic spirits. The first count was withdrawn, and hence is not material.

On this appeal it is first urged that the court erred in overruling defendant's motion to quash the indictment, and while this assignment is argued in the brief, the assignment was waived on oral argument, and will be given no further consideration.

The sufficiency of the evidence to sustain the verdict and judgment is vigorously assailed. At the close of the entire testimony the defendant interposed a motion for a directed verdict in his favor, and the overruling of this motion directly presents the question of the sufficiency of the evidence. The testimony in this case is entirely and wholly circumstantial.

It appears from the testimony that the defendant was the owner of a building at 1142 Independence avenue, Kansas City, Mo., on the first floor of which he was conducting a grocery store. From the time he acquired the property, which was more than three years prior to the date charged in the indictment, the second floor was leased to a Mrs. Effie Gatewood, whose lease or occupancy continued until after the date of the raid upon the premises and the arrest of the defendant by government agents. She seems also to have been a tenant of defendant's predecessor. She maintained an apartment, and from time to time rented rooms. This building apparently faced south on Independence avenue, and the second floor was reached either by means of the stairway leading from the sidewalk along the front of the building, or by means of a back stairway reached from the alley in the rear of the building. Each of these stairs went directly to the second floor, landing in a hallway on the second floor; these landings being on the same side of the hallway as shown by photograph, Defendant's Exhibit 7, so that one going up either stairway landed in the hallway on the second floor, the landings being in plain view of each other, although the distance between the landings is not shown. On entering from the alley or porch in the rear of the building is a hallway, and at the foot of the rear stairs is another door. In order to get upstairs from the grocery store, it was necessary to pass through a door in the rear part of the grocery store, into this hallway, pass along the hallway to the foot of the back stairs, a distance of about fourteen feet, open the door at the foot of the stairs, and pass up the stairs on to the second floor landing. This doorway in the back of the grocery store was kept locked and barred.

On the 12th day of September, 1928, certain prohibition agents made a search of these premises. Entering first the grocery store, they found the defendant in charge of his business. The store appeared to be a well-stocked grocery store. The rear door, whether in the extreme rear of the building, or in the east partition wall, is not clear from the testimony, was closed and barred by means of a wooden bar fitted into strong iron brackets or holders on either side of the doorway. It may also have been locked. Nothing was found on the first floor except a stock of groceries and fixtures and some tables and chairs, but on looking at the ceiling in the back part of the store building it was observed that at one spot some of the plaster was loose and some water had seeped through. The prohibition agents detected in this seepage an odor of mash. This portion of the ceiling was over a balcony or mezzanine floor and was not easily observed from the floor of the grocery store, nor did the seepage through the plaster come onto the floor of the grocery store proper, but was intercepted by this balcony or mezzanine floor. The agents then broke open the door leading from the grocery store into the hallway communicating with the back stair, and finding the door at the foot of this back stair locked, broke the lock, passed up the stairway to the second floor, and entering the door to the back room on the second floor found twenty-three barrels of mash, fifty-gallon size, fit for distilling, and a seventy-five gallon still set up complete but not in operation. The defendant told the agents that he owned the building and that the second floor was rented to a colored woman. The front part of the second floor was used for living purposes. The tenant, Mrs. Gatewood, testified that she sublet the back room where the still and mash was found to a man by the name of Jennings at a rental of $10 per month. That the contract for gas was in her name, and that she settled with the gas company and apportioned the expense with the defendant; the defendant paying her such portion, apparently, as she from time to time allotted to him.

A government witness testified that on September 11th, he had visited the vicinity of these premises between 9 and 10 o'clock in the morning, and while standing across the street on the south side, saw a young negro

rolling a barrel towards the defendant's grocery store. That the defendant opened the door and let him in, the barrel being a fifty-gallon barrel. That he waited in that vicinity about ten minutes and saw the boy come out of the store without the barrel.

Testimony on behalf of the defendant showed that Effie Gatewood had occupied the second floor of this building for about four years at a rental of $25 per month. That she had six rooms, and she produced evidence of payment of rent. She testified with reference to the entrances, and the fact that there were two stairways entering the second floor, but that neither of these stairways entered either directly to or from the grocery store, and that the hallway was not open to the grocery store, but shut off by a door which was barred with heavy wooden bars; that she worked in the daytime and stayed at home nights. It appeared that the gas bill ran from $2.17 in the month of September, 1927, to $16.81 in December, 1927; $15.96 in January, 1928; $24.12 in February, 1928; $26.31 in March, 1928; $24.46 in April, 1928; $16.68 in May, 1928; $10.52 in June, 1928; $12.39 in July, 1928; $12.73 in August, 1928; and $9.33 in September, 1928. The gas contract was transferred to the defendant in October, 1928, having prior to that time stood in the name of Mrs. Gatewood.

The defendant put his character in issue, and witnesses testified that his reputation for honesty and fair dealing, and for being a law-abiding citizen was good prior to September 12, 1928. The character testimony was not controverted by the government. It should be added that the defendant testified that he knew nothing whatever about who occupied the room where the still and mash were found; that he had no knowledge that a still was on the premises, nor that there was any mash on the premises. He testified that he had once observed a little leakage in the place referred to by the government's witnesses, but that he had been advised by the tenant that she had spilled some water in washing, or something of that sort, and that as the leakage did not come onto the main floor, but was intercepted by the balcony which he did not occupy, he paid no further attention to it, and did not observe any odor of mash.

 As has already been observed, the testimony is wholly circumstantial, and hence in order to sustain a conviction it must not only be consistent with the guilt of the defendant, but must be inconsistent with his innocence.

Evidence creating a suspicion of guilt is not sufficient. There must be substantial evidence of guilt beyond a reasonable doubt. Bishop v. United States (C. C. A.) 16 F.(2d) 410; Colbaugh v. United States (C. C. A.) 15 F.(2d) 929; Dickerson v. United States (C. C. A.) 18 F.(2d) 887; Haning v. United States (C. C. A.) 21 F.(2d) 508; Philyaw v. United States (C. C. A.) 29 F.(2d) 225; Van Gorder v. United States (C. C. A.) 21 F.(2d) 939; Grantello v. United States (C. C. A.) 3 F.(2d) 117; Salinger v. United States (C. C. A.) 23 F.(2d) 48; Beck v. United States (C. C. A.) 33 F.(2d) 107.

The circumstances relied upon in this case as establishing the guilt of the defendant are as follows: (1) The defendant owned the building in which the still and mash were found; (2) on the day previous to the search of the premises a boy was observed rolling an empty barrel to the front door of the defendant's store, and defendant was observed letting the boy into the store building with the barrel; (3) evidence of a leakage through the ceiling of the storeroom onto the balcony or mezzanine floor was observed by the government witnesses, who detected an odor of mash from the seepage; (4) the gas bills were larger in December, 1927, January, February, March, April, May, June, July, and August, 1928, than they had been in September, 1927, and larger than they were subsequent to the search of the premises on September, 1928. In connection with these circumstances, it is observed that while the defendant owned the premises involved, the upper floor was not in his actual possession, but was and had been under lease for a number of years. The upper floor was accessible through two stairways, neither of which connected directly with the defendant's store, and the only door through which the upper floor might be reached through the store was locked and barred. As to the circumstance that a boy was observed rolling an empty barrel into the defendant's store, there is nothing to identify this barrel as a mash barrel, or as one found in the room containing the still and mash. The testimony simply indicates that this was an empty barrel. As to the seepage through the plaster in the ceiling of the store, it appears that this seepage came through the broken plaster above a balcony or mezzanine floor, and that the seepage did not come onto the main floor of the storeroom occupied by the defendant; it was not readily observed; the balcony or mezzanine was not used by him, and he testified that he had observed no odor of mash, and while he had observed at one time a

slight leakage, it was explained to him as resulting from the spilling of some water on the second floor. As to the excessive gas bills, if it can be said that they were proved to be excessive, it appears that the contract for the gas was not with the defendant, but was in the name of the tenant on the second floor and had been in her name even before the defendant owned the premises, and that she apportioned to the defendant such part of the gas bill as he should pay, and it does not appear what portions of these bills he was called upon to pay; and hence there is no evidence to show that the gas bills as paid by him were out of the ordinary.

While circumstantial or presumptive evidence is allowed to prevail, even to the convicting of an offender, still the circumstances must themselves be proved and not presumed, and in this connection it is noted that the court, in commenting on the evidence while charging the jury, said: "If the defendant received a mash barrel and that mash barrel was carried on up stairs and put into the room where the mash was, and if the defendant aided and abetted when he admitted the boy into the room, there is sufficient in that; if he merely admitted the boy into the room with the mash barrel and let the boy go on into the room where the still was, etc." It was proved only that an empty barrel was taken to the front door of the defendant's place of business and the boy with the barrel admitted. The court then presumed from this circumstance that the barrel was a mash barrel, that the boy bringing this barrel to the defendant's premises was permitted to go through the room occupied by the defendant, with this barrel, which is described as a mash barrel, and he was permitted to take it into the upstairs room where the still was. This was presuming circumstances which had not been proved. The circumstances relied upon may be sufficient to raise a suspicion, but they are quite as consistent with the innocence of the defendant as with his guilt and fall far short of that certainty required by the criminal law, and the judgment must therefore be reversed for insufficiency of the evidence.

In view of the fact that this case must be retried, it is necessary to consider certain other assignments presented on this appeal.

The defendant produced witnesses who testified to the defendant's good reputation as a law-abiding citizen prior to the date of this charge. On cross-examination, the witnesses were asked, in substance, if they had heard that the defendant had been arrested a few years before on the charge of operating a still and operating a saloon. Objection was made to this testimony, but the witnesses were permitted to answer. One of the witnesses answered that he did not remember whether he had heard this or not, and the other denied having heard about it. The rule applicable in such cases is thus stated in 2 Wigmore on Evidence, § 988:

"The settled rule against impeachment by extrinsic testimony of particular acts of misconduct (ante, Sec. 979) is to be distinguished in its application from a kind of questioning which rests upon the principle that the witness' grounds of knowledge (ante Sec. 655) may always be inquired into. When witness A is called to support the character of B (either a witness or an accused), by testifying to his good reputation, that reputation must signify the general and unqualified consensus of opinion in the community (post Secs. 1610–1614). Such a witness virtually asserts either (a) that he has never heard any ill spoken of him or (b) that the sum of the expressed opinion of him is favorable. Now if it appears that this sustaining witness knows of bad rumors against the other, then, in the first instance, his assertion is entirely discredited, while, in the second instance, his assertion is deficient in good grounds, according to the greater or less prevalence of the rumors. On this principle, then, it is proper to probe the asserted reputation by learning whether such rumors have come to the witness' knowledge; for if they have, it is apparent that the alleged reputation is more or less a fabrication of his own mind. It is to be noted that the inquiry is always directed to the witness' hearing of the disparaging rumor as negativing the reputation. There must be no question as to the fact of the misconduct, or the rule against particular facts would be violated; and it is this distinction that the Courts are constantly obliged to enforce:

"1841, Parke, B., in R. v. Wood, 5 Jur. 225 (the witness had testified that he had never heard anything against the defendant, and was on cross-examination asked whether he had not heard of the defendant being suspected of a certain robbery in the neighborhood; on objection): 'The question is not whether the prisoner was guilty of that robbery, but whether he was suspected of having been implicated in it. A man's character is made up of a number of small circumstances, of which his being suspected of misconduct is one.'

"1889, McClellan, J., in Moulton v. State, 88 Ala. 119, 6 So. 758, 759, 6 L. R. A. 301: 'Opinions, therefore, and rumors and reports, concerning the conduct or particular acts of the party under inquiry, are the source from which in most instances the witness derives whatever knowledge he may have on the subject of general reputation; and, as a test of his information, accuracy, and credibility, but not for the purpose of proving particular acts or facts, he may always be asked, on cross-examination, as to the opinions he has heard expressed by members of the community, and even by himself as one of them, touching the character of the defendant or deceased, as the case may be, and whether he has not heard one or more persons of the neighborhood impute particular acts, or the commission of particular crimes, to the party under investigation, or reports and rumors to that effect.'

"On this principle such inquiries are almost universally admitted."

In 1 Greenleaf on Ev. (16th Ed.) § 461 d 4, the principle is stated in this form: "In testing a witness who speaks to good character, it will expose the untrustworthiness of his testimony, if he admits that rumors of misconduct are known to him; for the knowledge of such rumors may well be inconsistent with his assertion that the person's reputation is good. Accordingly the propriety of inquiring whether he had not heard that the person whose reputation he has supported has been charged with this or that misdeed has usually been conceded. A few courts, however, usually through a misunderstanding of the real purpose of the inquiry, and supposing it to be in violation of the rule against proving particular acts of misconduct, have forbidden it."

In Underhill on Criminal Evidence (3d Ed.) § 141, it is said: "But a witness to good character may be asked on cross-examination to test his credibility whether he has heard rumors of particular and specific charges of the commission of acts inconsistent with the character which he was called to prove, generally as to the grounds of his evidence, not so much to establish the truth of such facts or charges, as to test his credibility, and to determine the weight of his evidence. He may be asked if he has not heard some general report which contradicts the good reputation which he had been called upon to prove."

Other text-writers are in accord. 1 Taylor on Ev. (11th Ed.) § 352; 2 Starkie on Ev. 304; Best on Ev. § 261; 4 Chamber-

layne on Ev. §§ 3314, 3316; 3 Rice on Ev. § 376; 16 Corp. Jur. 582; 1 Thompson on Trials (2d Ed.) § 524; 8 Rul. Case Law, p. 211.

The adjudicated cases generally support these views. Lewis v. State, 13 Ala. App. 31, 68 So. 792; Weakley v. State, 168 Ark. 1087, 275 S. W. 374; People v. Burke, 18 Cal. App. 72, 122 P. 435; Brindisi v. People, 76 Colo. 244, 230 P. 797; Cook v. State, 46 Fla. 20, 35 So. 665; Frank v. State, 141 Ga. 243, 80 S. E. 1016; McDonel v. State, 90 Ind. 320; State of Iowa v. Arnold, 12 Iowa, 479; State v. Killion, 95 Kan. 371, 148 P. 643; Turner v. Commonwealth, 185 Ky. 382, 215 S. W. 76; State v. Pain, 48 La. Ann. 311, 19 So. 138; Commonwealth v. O'Brien, 119 Mass. 342, 20 Am. Rep. 325; People v. Pyckett, 99 Mich. 613, 58 N. W. 621; State v. Parker, 172 Mo. 191, 72 S. W. 650; Basye v. State, 45 Neb. 261, 63 N. W. 811; State v. Sella, 41 Nev. 113, 168 P. 278; State v. Knapp, 45 N. H. 148; People v. Laudiero, 192 N. Y. 304; 85 N. E. 132; Zeltner v. State, 13 Ohio Cir. Ct. (N. S.) 417; Russell v. State, 17 Okl. Cr. 164, 194 P. 242; State v. Harvey, 117 Or. 466, 242 P. 440; State v. Merriman, 34 S. C. 16, 12 S. E. 619; Tucker v. State, 149 Tenn. 98, 257 S. W. 850; Skelton v. State, 106 Tex. Cr. R. 90, 291 S. W. 238; State v. McMullen, 142 Wash. 7, 252 P. 108. A contrary rule has prevailed in North Carolina and Illinois. See State v. Wilson, 158 N. C. 599, 73 S. E. 812; Jennings v. People, 189 Ill. 320, 59 N. E. 515 (see comments on these cases, 2 Wig. on Ev. § 988, note 1). But in People v. Willy, 301 Ill. 307, 133 N. E. 859, 864, it is stated: "It is error to permit a character witness to be cross-examined as to his own knowledge of particular acts of bad conduct by the accused, but a witness to good character may be asked, on cross-examination, if he has heard rumors or conversations of particular charges of the commission of acts inconsistent with the character which he is called upon to prove. Underhill on Crim. Evidence (2d Ed.) § 82."

The decisions in the United States courts have been in harmony with the general rule. Jung Quey v. United States (C. C. A.) 222 F. 766, 771; Mitrovich v. United States (C. C. A.) 15 F.(2d) 163, 164; Clark v. United States, 57 App. D. C. 335, 23 F.(2d) 756. In the last case cited the court said: "The overwhelming weight of authority supports the view that character witnesses, testifying to the good reputation of the accused, may be asked on cross-examination whether they had not heard one or more persons of the neigh-

borhood impute particular similar crimes to the accused, or reports and rumors to that effect. In the present case, it may be noted, the accused was undertaking to prove a good reputation for honesty, and the question complained of related to the same trait of character, and related to a time prior to the date of the alleged crime for which the accused was being tried. ' * * * On cross-examination, however, it seems that the (character) witness may be interrogated as a test of his information, accuracy, and credibility, but not for the purpose of proving particular acts or facts as to the opinions he has heard expressed by members of the community, touching the character of the defendant and whether he has not heard one or more persons of the neighborhood impute particular acts, or the commission of particular crimes, to the party under investigation, or reports and rumors to that effect.' " 8 R. C. L. § 205.

To the same effect, 2 Wigmore on Evidence, § 988; 16 C. J. § 1125, p. 582, and authorities therein cited. Compare, also, State v. Dickerson, 77 Ohio St. 34, 82 N. E. 969, 13 L. R. A. (N. S.) 341, 122 Am. St. Rep. 479, 11 Ann. Cas. 1181, where the witness testified to actual traits of character only, and not to general reputation of the accused.

In State v. Bateham, 94 Or. 524, 186 P. 5, 8, it is said: "The doctrine is that when a defendant, as he only can, tenders his supposed good character in evidence to influence the scale in his favor, he thereby invites scrutiny and disclosure of specific, generic instances of his misconduct to depreciate the weight of the testimony of his character witnesses, although the answers elicited may incidentally impute to him other guilt. Although it is a recognized element of cross-examination, it is subject to discretionary control of the trial judge, who will restrain its abuse. It is quite impossible definitely to fix the boundary between pettifoggery on one hand and proper cross-examination on the other, so as to govern all cases with exactness. It must be left to the discretion of the presiding judge, acting in the light of the circumstances of the case before him, subject to reversal if an abuse of discretion appears."

The reason for the rule is thus expressed in Brindisi v. People, 76 Colo. 244, 230 P. 797, 801: "When a witness has testified to reputation no cross-examination can be effective which precludes an inquiry into what the witness has heard and upon which his con-clusions must be based. If, having ample opportunity, he has heard nothing, or has heard only what is good, the inference is most favorable. If he has heard only what is bad it is the contrary. If he says the reputation is good and admits having heard much, that is derogatory his conclusion is greatly weakened if not destroyed. Suppose a witness testifies that the reputation of a defendant is good when in fact he never heard him spoken of save by two persons, both of whom stated that he was an outlaw who had served a term in the penitentiary for murder. What a farce to protect such evidence from the acid test of cross-examination which, if applied, would annihilate it."

The appellant cites the decision of this court in Sloan v. United States, 31 F.(2d) 902, as applicable. In that case the character witnesses had testified that the defendant's reputation was good "for truth and veracity, honesty and good citizenship." On cross-examination they were asked if they had read a newspaper statement that officers had found whisky, false whisky labels, empty bottles, and counterfeit revenue stamps in the defendant's room. The questions, in this form, did not refer to any charge or rumor against the defendant, but to the ambiguous fact that articles had been found in his room. The reading of such an account would not be in refutation of the witnesses' testimony that the defendant's reputation had been good.

In the present case the cross-examination sought to weaken the witnesses' assertions that the defendant's reputation as a law-abiding citizen was good, by proof that they had heard of defendant's arrest on a charge of operating a still and a saloon. In view of what has been said as to the admissibility of such evidence, there was no error in the ruling of the court permitting the cross-examination.

The refusal of the court to give certain instructions requested by the defendant with reference to the effect of the leasing of the premises, and thereby vesting the lessee with the right of possession thereof, is assigned as error. While the instruction might properly have been given, the court, we think, fairly covered the ground by its instructions as given, and the refusal to give the requested instructions was therefore not reversible error.

Error is also urged in the refusal of the court to give defendant's proposed instruction on the question of circumstantial evidence, but this question we think was fairly covered by correct instructions given by the

court, and hence the refusal to give the requested instructions was not reversible error.

■ It is next urged that the court erred in its refusal to give an additional charge as requested by defendant as to the definition of aiding and abetting, as applied to the offenses charged in the indictment. The charge as given contains no definition as to what constitutes aiding and abetting. It simply states that, "Under the Federal law one who aids or abets the commission of a crime is just as guilty as one who commits the crime and may be charged as principal." By way of illustration, however, the court, in effect, explains to the jury what is meant by aiding and abetting, and while we think the court might well have given a further instruction defining aiding and abetting as applied to the offenses charged in the indictment, we do not think the omission constituted reversible error.

■ It is earnestly argued that the court went beyond the legitimate bounds of commenting on the evidence in his charge to the jury and entered the realm of argument. We have examined the portions of the charge complained of, and no good purpose would be served by setting them out in this opinion. A wide discretion is vested in the trial court, yet under the Constitution one accused of a criminal offense is entitled to a determination of the facts by a jury. It is not the province of the court to indulge in an argument, and in commenting on the evidence the court should not comment upon and refer only to the evidence of guilt. As said by this court in an opinion by Judge Kenyon, in Cook v. United States, 18 F.(2d) 50, 52, after reviewing many of the authorities: "These cases cannot all be harmonized, but we think the line of demarcation between what a court may say to the jury in a criminal case in expressing his opinion on the facts, and what he may not say, is to be drawn between mere expression of opinion not partaking of such argumentative nature as to amount to advocacy, leaving to the jury absolute freedom to determine the facts, and such discussion as amounts to an argument and makes the court in fact an advocate against the defendant. A trial judge is not merely a moderator or umpire; neither is he an advocate. * * * Everyone knows that suggestions from the court have great weight with a jury, and the argumentative language used in this instruction must have seemed to the jury an advocacy of the government's case, and impressed upon them the court's desire for a conviction. We think it was not such judicial discussion of the evidence as is permissi-

ble." See also Weare v. United States (C. C. A.) 1 F.(2d) 617; Sunderland v. United States (C. C. A.) 19 F.(2d) 202; Baumboy v. United States (C. C. A.) 24 F.(2d) 512; O'Shaughnessy v. United States (C. C. A.) 17 F.(2d) 225; Cook v. United States (C. C. A.) 14 F.(2d) 833; Buchanan v. United States (C. C. A.) 15 F. 496; Rudd v. United States (C. C. A.) 173 F. 912; Starr v. United States, 153 U. S. 614, 14 S. Ct. 919, 38 L. Ed. 841; Gold v. United States (C. C. A.) 36 F.(2d) 16.

As the cause must be reversed on other grounds, and it is not likely that the same comments on the evidence will again occur, we need not determine whether or not the comments by the court on the evidence in his charge to the jury were such as to require reversal.

For the reasons stated, the judgment must be and is reversed, and the cause remanded for a new trial.