HILL v. STATE. (No. 3955.)

(Court of Criminal Appeals of Texas. March 1, 1916.)

RAPE ☞51(1) — STATUTORY RAPE — CONVICTION REVERSED.

A conviction of statutory rape upon very weak evidence, where objections were made in admission and exclusion of evidence and refusal of instruction, will be reversed.

[Ed. Note.—For other cases, see Rape, Cent. Dig. § 71; Dec. Dig. ☞51(1).]

Prendergast, P. J., dissenting.

Appeal from District Court, Mills County; John D. Robinson, Judge.

E. A. Hill was convicted of rape, and appeals. Reversed and remanded.

J. C. Darroch, of Goldthwaite, and Wilkinson & McGaugh, of Brownwood, for appellant. C. C. McDonald, Asst. Atty. Gen., for the State.

HARPER, J. I cannot concur in the affirmance of this case, and will state my reasons.

In the first place, the evidence is very weak, if in fact sufficient to sustain a conviction. Appellant was indicted, charged with the offense of rape on his daughter, Viola, when 13 years of age. Viola swears most positively that her father had never had sexual knowledge of her. She was called as a witness by the state, and in answer to an inquiry stated: "He (my father) did not have intercourse with me." What she testified before the grand jury is not in the record before us, and if it were (whatever that testimony may have been) it would be no evidence of appellant's guilt. He can only be convicted on evidence given by the witnesses on this trial, and the girl alleged to have been raped most emphatically denies it. However, five members of the grand jury say that appellant was before that body twice, and when first before it he admitted having penetrated the girl, although denying that there was any emission. They say when he came back the second time he denied having penetrated the girl, but admitted improper fondling of her person. The foreman of the grand jury and another member of that body say they were present when appellant was before that body, and they testify that on both occasions he denied having sexual intercourse with the girl. So the matter of whether or not appellant made a confession before the grand jury is a disputed fact, but to concede that on this conflict of testimony a jury would be authorized to find that he admitted the fact, still it has always been held that a confession alone is insufficient to sustain a conviction. Harris v. State, 28 Tex. App. 308, 12 S. W. 1102, 19 Am. St. Rep. 837; Brady v. State, 32 Tex. Cr. R. 264, 22 S. W. 924; Nolan v. State, 60 Tex. Cr. R. 5, 129 S. W. 1108, Ann. Cas. 1912B, 1248; Layton v. State, 52 Tex. Cr. R. 513, 107 S. W. 819; Ellison v. State, 59 Tex. Cr. R. 3, 127 S. W. 542; Follis v. State, 51 Tex. Cr. R. 190, 101 S. W. 242; and cases cited in these opinions.

It is also the law that, while a confession alone is insufficient to sustain a conviction for crime, yet it may be considered in connection with other facts and circumstances in the case in proving the corpus delicti. Kugadt v. State, 38 Tex. Cr. R. 694, 44 S. W. 989, and cases cited in Branch's Crim. Law, § 235. We then must look to the record for other facts and circumstances in aid of the confession, which tend to show that a crime has been committed, and appellant guilty of the crime, if a crime is shown. It must be remembered that the girl alleged to have been raped emphatically denies that she was raped by appellant. Then what other matters are in the record, outside of the confession, which tend to show that a crime has been committed? The state called Dr. Campbell as a witness, and he testified he examined Viola and found that her hymen had been ruptured. If this was all of the doctor's testimony, it might tend to show that some one had had carnal knowledge of the girl; but that is not all of his testimony on direct examination. He says the rupture could have been caused by masturbation, by use of the fingers, by accident, or other causes, and then adds:

"I found she had a very small vagina. I do not think it was possible for the defendant to penetrate her past the vagina without extending the canal. I do not think it would be possible for a male organ to penetrate as small a vagina as she had."

This testimony was all given on direct examination, without reference to the cross-examination, and, if we take the testimony of this expert witness, he says from an examination of the girl he does not think she had been penetrated by the male organ of a man. And this is all the testimony, outside of the alleged confession, to prove that the girl had ever been penetrated by any man. I am inclined to think it insufficient to show that the crime had in fact been committed, in the face of the positive denial of the girl alleged to have been wronged. But concede that, weak though it be, it is sufficient to show that a crime had been committed; what is there in the record to show that appellant was the criminal outside of the alleged confession? The only fact proven was that he sometimes slept in the same bed with his 13 year old daughter. The mother says she also slept in the same bed with them, but the daughter says her father sometimes alone slept in the same bed with her. If the daughter is correct, that he sometimes alone slept with her, then this gave an opportunity, but nothing more, and the daughter says he did not avail himself of the opportunity, and this is proven, not by appellant, but by the state on direct examination of the girl. That a father sleeps in the same bed with his 13 year old daughter may be a suspicious circumstance, but certainly nothing more, if that. These are all the facts in the record that can be construed to aid the alleged confession in proving that a crime has been committed and appellant the criminal, and the writer extremely doubts the sufficiency of such testimony. At least it is very weak, and if improper testimony was admitted, which might or could have influenced the jury, then certainly a verdict based upon so unsatisfactory evidence ought not to be permitted to stand.

Appellant introduced Lee Chancelor and Hugh Henry, who say they had lived in the same community with appellant for 22 years, and Rev. J. W. Collin, pastor of the Baptist Church, who says he has lived in the same community for 4 years, and they all swear that his reputation as a good, moral, law-abiding man is good. On cross-examination of Messrs. Chancelor and Henry, the state asked them if some 13 years ago appellant had not been charged with having had intercourse with a niece. They said such rumor had been in circulation, but at appellant's request it was investigated by his church, and it was found without foundation, and that James Scroggins, who had put the report in circulation, wrote a letter to appellant in which he admitted he wronged appellant in making such a charge, and asked the forgive-

ness of appellant. The state, having thus fallen down on proving anything hurtful to appellant's reputation prior to the time this charge was brought against him, was permitted, over the objection of appellant, to prove that since this charge had been brought against him "they had heard that appellant had admitted he had had intercourse with his other two daughters, Mrs. Beshear and Mrs. Dean, in their childhood days." I do not think what they had heard since this charge had been brought against him about his other two daughters was admissible, and it was of such a nature that it would have its weight with the jury, and could not be controlled by the charge of the court. It was inadmissible for any purpose. What they had heard about reports in circulation since this prosecution was begun could not, and should not, have been permitted to affect his reputation for all the years prior to the date of the institution of this prosecution. Such reports could and often are put in circulation by maliciously inclined persons, after prosecution is begun, and we have always understood the rule to be that, as affecting the source of knowledge and information of the witness, it is as to knowledge of acts and conduct prior to the institution of the prosecution that can be inquired into, and it is not reports, etc., growing out of the prosecution, that become admissible as affecting the knowledge of the witness who testifies that prior to the institution of this prosecution the reputation of the person on trial has been good. This, in my opinion, illegal testimony about a report in circulation that appellant had admitted having intercourse with his other two daughters in their childhood days, heard of by the witness in this case for the first time, as shown by this record, by any one since the institution of this prosecution, was of a nature and character to aid otherwise a very weak case for the state, and, had it not been permitted to go to the jury, a verdict of guilty might not have been obtained. This question was before this court in Hopperwood v. State, 39 Tex. Cr. R. 18, 44 S. W. 841, and it was there held:

"Where a defendant is on trial, it is his character prior to the commission of the offense that may be inquired into, and not the character he may have had after the commission of the alleged offense, or what was said about his character after that time. On this subject, Mr. Rice, in his work on Evidence (volume 3, p. 610), quotes with approval what was said on this subject in Reid v. Reid, 17 N. J. Eq. 101, as follows: 'No rule is better settled or founded on clearer principles than that which excludes all testimony touching reputation founded on opinion expressed post litem motam.' It is true the act charged against the defendant in this case is said to have occurred prior to the commission of the offense for which he was on trial, but the witness had not heard that matter spoken of until after the commission of this offense; and evidently the discussion of the alleged theft in this case caused the other matter to be spoken of. So far as the record shows, these witnesses had not heard of the prior act until after the alleged commission

of this offense. They did not previously know that he had ever been accused of any dishonest act. They had never heard anything mentioned of his character in this respect. Evidently, such testimony was inadmissible for any purpose."

Again, when the mother was being examined, she was asked if her daughter ever made any complaint. The court refused to permit her to answer the question. I think, under the record in this case, this was error. The doctor had testified the vagina was very small and there could have been no entry without a rupture and laceration occurring, and that soreness and inflammation would ensue. If this condition had occurred, a child of the age of this one would certainly complain to the mother of such matters, and that no complaint had ever been made was a circumstance to show that nothing of that kind had occurred.

I also think that the charge requested, that unless they found the confession, if made, was freely and voluntarily made, it should not be considered, should have been given. The record discloses that intense ill will existed between one of appellant's sons-in-law, John Beshear, and appellant; that this son-in-law was admitted in the grand jury room while appellant was being examined by that body; that this son-in-law had to be disarmed, and while appellant was testifying before the grand jury this son-in-law "got over Mr. Hill and shook his finger in his face." This was not orderly proceedings in the grand jury room, and there is no reason shown why this son-in-law, who was not a member of the grand jury, was allowed to sit with that body, nor why he should be permitted to stand over a witness and shake his finger in his face while being examined, and Mr. Head says Beshear was permitted to propound to appellant questions about other matters while appellant was before the grand jury. Under the circumstances this record discloses, the charge, when requested by appellant, that if a confession was made, unless it was freely and voluntarily made, to disregard it, should have been given.

In my opinion the evidence to sustain a conviction is very weak, if not insufficient to sustain a conviction. It shows the prosecution is the outgrowth of a family row, and, taking the record as a whole, I am of the opinion the judgment should be reversed and remanded.

DAVIDSON, J. I concur in the reversal of the case.

PRENDERGAST, P. J. (dissenting). Appellant was convicted of the rape of his own daughter Viola Hill, and his punishment assessed at eight years' confinement in the penitentiary.

The uncontradicted evidence shows that the girl Viola was just about three months under 14 years of age at the time of the alleged offense. The indictment does not allege, nor does the proof show, that, if appellant committed the act, it was by force, fraud, or threats, but, if committed, it was by consent.

Five grand jurors testified positively that, when they were investigating the charge against appellant, he testified before the grand jury that, about the time charged in the indictment, he twice had sexual intercourse with his said daughter Viola, and indicated with his finger the depth of penetration, which was about an inch or more; that his purpose in putting his privates in her privates was to appease his passion; that he penetrated her to appease his passion; that one time he merely entered the lips, and the other time he "pushed it in that far" (indicating an inch or more), but that he did not ejaculate in her; that he had slept with her, or been in bed with her, at different times; that with his hand he had for some time fondled her privates, and he did that just because he wanted to; that, when he gave this testimony, his son-in-law John Beshear was present in the grand jury room; that, at one time during the examination of appellant, said Beshear got over him and shook his finger in his face, but that Beshear asked him no question as to his relation with Viola, but had reference to another matter. It seems that appellant and Beshear were hostile towards each other, for each was searched for weapons at the time they were before the grand jury; but there was no evidence whatever that either had any. Each of these five grand jurors further testified that appellant, in about 15 or 20 minutes after he was first before them and dismissed, returned, and then stated to them in substance that he had studied over the matter since first before them, and decided that, if he said as he had previously testified he knew he would go to the penitentiary, that he did not want to take a trip to the penitentiary, and then denied his former statement that he had had intercourse with Viola, but at that time he also testified that he had fondled her privates with his hand. He did not then, or at any other time, swear that his first testimony was not voluntary, but merely as stated; that he did not want to go to the penitentiary. His testimony on that point was then taken down in writing, which he signed and swore to, and was:

"I have had my hands and fingers on her privates. I have had my hands on her privates as much as twice for licentious purposes."

He also swore at this second time:

"I have never had intercourse with Viola. I have never touched Viola's privates with my privates."

The state introduced Dr. Campbell, who testified that, at the grand jury's instance, he made an examination of Viola's private parts, both by sight and with his finger, inserting his finger; that he found that the hymen had been ruptured, but, being so

long after the alleged offense, he could not tell what caused the rupture; and that her parts in that length of time would not show even if she had been penetrated. The examination was made something like ten months after the alleged act. This witness testified on direct examination, then on cross-examination, and then back and forth several times on redirect and recross examination. The effect of his testimony further was that it was frequently the case that the hymens of young girls was ruptured by the finger and by masturbation, and sometimes girls had no hymens at all, and that it was not unusual to find absence of the hymen, and that could be caused by the injection of the finger, or anything else, and that that was common.

Said girl, Viola, testified that she had never abused herself by inserting her fingers or anything of that kind in her privates; that she had never had her fingers in her privates. She further testified positively that her father had never had intercourse with her and had never fondled her person or privates with his hands or fingers. It appears that, when she was before the grand jury, she testified that her father had had sexual intercourse with her twice. On this trial she was shown to be very hostile to the state and very much in favor of her father. She refused to talk to the district or county attorney, but was repeatedly, according to her testimony, talked to by appellant's respective attorneys, and that they saw her soon after she was before the grand jury, and that they had told her that, if she testified that her father had had sexual intercourse with her, they would send him to the penitentiary or break his neck, and that they advised her that the district attorney had no right to examine her until she was sworn as a witness. She further testified that she understood the law to be that, if she testified her father had intercourse with her, he was liable to be hanged. She said:

"I would not swear a lie to get my father out of jail. Nor would I swear a lie to keep him from being hanged. I am sure of that. I know I would not swear a lie. I did not tell the truth before the grand jury. I told a lie. I did it through fear of John Beshear."

She further testified:

"My father has slept with me at our home in Mills county, but not often. Nobody else slept in the bed with us."

Her mother, appellant's wife, swore:

"My daughter slept with her father sometimes, and I knew of it. I slept with them, too; all three slept in the same bed. That has continued all her life until lately. She sleeps with me now."

Two other of the grand jurors testified that they were present at both times when appellant was before the grand jury and testified. These two each swore, in substance, that they did not hear appellant when he was first before them testify that he had had the two acts of sexual intercourse with his said daughter. The effect of their testimony as a whole is in a negative form; that they did not hear it. They thought they were where they could have heard him if he did so testify, but that he might have done so and they not have heard it.

Appellant put his general reputation as a law-abiding man in issue before the jury. Lee Chancelor, for him, swore that he had lived a near neighbor to him for 22 years and was acquainted with his general reputation "as to whether or not he is a law-abiding man or otherwise," "and that reputation is good as far as I know." Mr. Hugh Henry, for him, testified that he had lived in the same community with appellant about 22 years and was acquainted with his general reputation "as to being a good, moral, law-abiding man"; "that reputation is good, and has been good all the time, as far as I know." J. W. Collin, for him, testified that he was the pastor of a Baptist Church and had known and lived in the same community with appellant about four years; that he was acquainted with appellant's general reputation in that community as to being a good, moral, law-abiding citizen; "and that reputation is good."

The state introduced W. C. Johnson, who testified that he had lived in the same community with appellant for about eight or nine years; that he thought he knew his general reputation in that community as a virtuous or chaste man or otherwise. "I believe that reputation is bad." On cross-examination, he testified that appellant's reputation was not based on the prosecution in this case; that he had heard a number of people talking about his reputation, and among them were J. F. Blackburn, Janus Scroggins, R. F. Stevens, Wylie Henry, J. J. Davis, Mr. Wiggins, A. J. Johnson, Fred Johnson, Mr. Jefferies, and Mr. Mayes; that a number of his neighbors had talked to him, and he had talked to them about it; that he did not know that he could call the names of all of them who had talked with him; that he had heard about all his neighbors speak about it. Appellant was a member of the Baptist Church. Mr. Collin was his pastor, and said witnesses Chancelor and Hugh Henry were members of the same Baptist Church. Mr. W. C. Johnson further testified that most of the men he had named as discussing appellant's bad reputation were members of the same Baptist Church, except said Stevens, Jefferies, and Blackburn.

Appellant then introduced Wylie Henry, who testified that he had lived in the same community with appellant for about 19 years and knew said W. C. Johnson, and that he had no recollection of having any conversation with Johnson or in his presence, wherein they discussed the character of E. A. Hill, and that he did not think he ever had any discussion with any party concerning his virtuous qualities and had never said anything detrimental to him. He said, however, that Mr. Johnson was an honorable man, and

he thought he was honestly mistaken as to him being one of the men who talked to him, but that either one of them, however, could be mistaken. Appellant then introduced J. T. Williams, who testified that he had lived in the same community 18 or 20 years; that he had never talked with W. C. Johnson in which he discussed appellant's character. On cross-examination, he said he did not think he was ever present in any crowd when it was discussed, and that he was never present when anything was said about appellant's conduct with his girls, or anything of that kind. He said, "Mr. Johnson and I have talked that." Again, on redirect examination, he said that he had never said anything against the virtue of Mr. Hill in Mr. Johnson's presence. On recross-examination, he further said: "We have discussed his conduct towards his own girls and other girls since this came up." It is noticeable that neither Wylie Henry nor J. T. Williams testified to his good reputation, and none of his other neighbors, it seems, would so testify, except his pastor and two of his fellow members and fellow deacons, Chancelor and Hugh Henry, and their testimony on this point is noticeable in that each testified only that his reputation was good "as far as I know."

The court committed no reversible error in sustaining the prosecuting officer's objection to Dr. Campbell answering that masturbation was very frequent in girls of the age of Viola Hill. She swore positively on this subject, as stated above, and the doctor was permitted to testify to any and every thing that would cause a rupture of the hymen in a girl.

Neither did the court commit any error in refusing to permit Mrs. Hill to testify that Viola had, about the time of the alleged rape or at any time thereafter, made no complaint to her of any ill treatment on the part of her father. Judge White, in section 1073, p. 680, of his Ann. C. C. P., says:

"The rules with regard to evidence of outcry and complaint by the prosecutrix in cases of alleged rape have no application to the rape of a female under the age of consent, because carnal intercourse with such female is rape, whether with or without her consent. Hamilton v. State, 36 Tex. Cr. R. 372 [37 S. W. 431]."

As stated above, Viola swore positively that her father never at any time had intercourse with her, or attempted to do so, or fondled her privates in any way at any time with his hands. Even if her testimony in this particular was untrue, the appellant's sworn testimony before the grand jury, and the other facts and circumstances, would all show that, if the act was had, it was with her consent, and, of course, if with her consent, she would not complain to her mother; and the fact, if so, that her mother would have testified that she made no complaint, under the circumstances, would in no contingency present reversible error. Even if, under any circumstances, such testimony by her mother would have been admissible, it was so remote and

would have had such a remote bearing on the case, if any, that the refusal of the court to permit it should not result in a reversal.

In the cross-examination by the state of appellant's character witness Hugh Henry, he testified that he did not know that he had heard of the charges against appellant of having intercourse with his niece Ony Scroggins, yet such was the rumor as to some of his nieces; that he did not know how long it was rumored that he had intercourse with some of his nieces; that he did not know of it breaking out for several years, but that it was the rumor then; that, when this came up, the rumor about his having intercourse with his two older daughters came up, and it was not the general rumor that he had carnal intercourse with his niece and his two daughters, for one of them, Mrs. Dean, had to be excepted; that the rumor was about his niece and Mrs. Beshear and soon died away; that there had been nothing discussed of it for years. No objection whatever was made by appellant to this testimony or this cross-examination of his witness Hugh Henry.

After his witness Chancelor on direct examination had testified, as shown above, about appellant's general good reputation so far as he knew, the state, on cross-examination of him, without any objection at all by the appellant, had him testify that he and appellant were both members of the Baptist Church; that he was on a committee once to investigate him for carnal intercourse with another little girl; that some people said he was guilty; that he did not think a good many said he was guilty; that there was a general rumor up there that he had carnal intercourse with his niece, who was of tender age, and he gave her a calf for it; and that they investigated that. Then, on redirect examination, he explained that it was at appellant's request that they had that investigation, and that to the best of their knowledge they found it to be false, and exonerated him; that, as well as he remembered, that was 13 or 14 years ago, but he did not remember just exactly how long. In substance, he further said that he saw a letter from Janus Scroggins, appellant's nephew, to him, in which Scroggins said to him that he had done him a wrong and asked his forgiveness, etc.; that Scroggins was the man who had made the charge. Then the state again had him on recross-examination, and he testified that the investigation they made was of appellant's improper conduct with Ony Scroggins. Then at the instance of the state, over appellant's objection, he testified:

"I have heard since this came up that Mr. Hill has signed a sworn statement admitting that he had intercourse with his daughter, Mrs. John Beshear, a number of times, and commenced having intercourse with her from the time she was seven until the time she was married, and since this came up I have heard he was in the habit of having intercourse with his other daughter, Mrs. Dean. I heard it this morning that he did admit having intercourse with Ony Scroggins some time ago."

After Rev. Mr. Collin had testified for appellant on direct examination, as shown above, on cross-examination, at the instance of the state, he testified: That appellant was a member of his church, and they worshipped together. He was pastor, and appellant deacon. That he had seen Mrs. Dean. "I did not understand they had a ruckus about the old man having carnal intercourse with her." No objection whatever was made by appellant to this part of the witness' testimony on cross-examination. But, over his objections, the court permitted the state to have Rev. Mr. Collin to further testify, on cross-examination:

"I have heard it about his niece. She is married, and that all occurred before I came there, but I do not suppose she was married at the time it occurred. I have not heard it rumored in the country that he had intercourse with the two older daughters until this case came up."

To the testimony above last quoted, only, appellant excepted. He did not except to the balance of this witness' cross-examination, which was:

"I have not heard him charged with having intercourse with any other little girls in the neighborhood. I do not know that he has not. As to whether a man who is charged by his neighbors with having intercourse with his little niece is a man of good moral character or not, it is owing to whether it was true or not."

I have stated both of these matters in two of appellant's bills so as to discuss them together. His objections to said portions of the testimony of each of these witnesses were: (1) Because their answers showed that they had not heard of said matters until after the alleged commission of the offense in this case; (2) because the knowledge or information of said witnesses as to the rumor in the country that he had had intercourse with his two older daughters was subsequent to the alleged commission of the offense in this case.

As to this testimony, the court correctly charged the jury as follows:

"Certain evidence has been admitted in your hearing relating to the defendant's conduct with certain other persons, including his daughters other than Viola Hill, and you are instructed that such testimony was admitted solely for the purpose of showing the means of knowledge of the witnesses as to the reputation of the defendant in the community in which he lives, and you cannot consider the same for any other purpose nor as evidence of the defendant's guilt as charged with Viola Hill."

As shown above, appellant himself put his reputation in issue, and of all his many neighbors he could find only three, his pastor and two fellow deacons, to only qualifiedly testify that his reputation was good. Another of his neighbors, Mr. W. C. Johnson, testified that his reputation was bad, and he knew quite a large number of his other neighbors, whom he had heard discuss his reputation as that of being bad. As shown also in the cross-examination of his witness Hugh Henry, no objection whatever was made on cross-examination of the charges he had heard against him in his commu-

nity of having intercourse with his niece, Miss Scroggins, and at least one of his daughters, Mrs. Beshear. Then, I think it clear that the state had the right to probe, on cross-examination, his pastor and his two other fellow deacons to know if they too, had not heard of his illicit connection with his said niece and one or both of his other daughters, and perhaps others; and the fact that his pastor denied that he had ever heard of any such things, until after this prosecution began, and the two deacons, that it was discussed after this prosecution was begun, certainly would not render their cross-examination inadmissible. The jury had the right to know that, if all of these other witnesses had heard of the fact of his having intercourse with all these other parties, why it was that they had not heard it until this prosecution began. It was only on cross-examination this could be developed. What I have said about these bills applies to the testimony of J. T. Williams on cross-examination, objected to.

It will be noted that the state did not draw out this testimony on cross-examination for the purpose of having those witnesses testify to his bad reputation. All that the state was after was probing their knowledge when they qualifiedly testified to his good reputation. One of the greatest objects in cross-examination is to probe the knowledge of the witness when he testifies to any fact. It is also a well-known principle that great latitude is and must be allowed in cross-examination.

There are many cases by this court directly in point against appellant's said contention. In Forrester v. State, 38 Tex. Cr. R. 248, 42 S. W. 401, a rape case, in an opinion written by Judge Henderson, this court stated and decided as follows: The defendant having placed Bell on the stand, by whom he proved his good reputation in the neighborhood in which he lived for chastity and virtue, on cross-examination the district attorney asked him:

"Did you ever hear your brother George Bell say anything about the defendant being too thick with Mattie Pickett? Tell us what you heard him say."

To which the witness answered:

"I have heard him say that he was too thick with Mattie Pickett, but nothing about the other one."

Various objections were made to this testimony. All of which is more fully shown by the bill and more fully stated in the opinion. Judge Henderson said:

" 'While particular acts of bad conduct are not admissible to assail character on the direct examination, a witness deposing to general character may be cross-examined as to the particular facts, in order to test the soundness of his opinion, and elicit the data on which it was founded.' See 3 Rice on Crim. Ev. § 376; Jackson v. State, 78 Ala. 471; Steele v. State, 83 Ala. 20, 3 South. 547; 1 Tayl. Ev. § 352; 2 Starkie, Ev. 304. The same author (Rice on Crim. Ev. § 375) uses the following language: 'There can be no doubt that, when a witness is put up-

on the stand to attack or defend character, he can only be asked on the examination in chief as to the general character of the person whose character is in question; and he will not be permitted to testify to particular facts, either favorable or unfavorable to such person, but, when the witness is subjected to cross-examination, he may then be asked, with a view to test the value of his testimony, as to particular facts. In the eye of the law, the character of a person is to be ascertained by any inquiry as to what is generally said or thought of him in the community where he resides. Hence, when a witness has testified on his examination in chief that the person as to whose character the inquiry is instituted bears a good character, his opinion and the value of it may be tested by asking the witness on his cross-examination whether he has ever heard that the person whose character is in question has been accused of doing acts wholly inconsistent with the character which he has attributed to him'—citing State v. Merriman, 34 S. C. 16, 12 S. E. 619. * * * It appears to us that the rule enunciated in these authorities states the correct and logical rule on the subject; and, applying that rule to the testimony admitted in this case, it occurs to us that the testimony was admissible, and that the court did not err in holding it so."

This Forrester Case, and the principle announced in it, was recently cited and reaffirmed in Newell v. State, 145 S. W. 939, in an opinion by Judge Davidson. Mr. Branch also lays down the same rule in his Criminal Law, § 877, p. 561, and cites several cases from this court in support of his text. Holloway v. State, 45 Tex. Cr. R. 303, 77 S. W. 14.

Again, another principle is well established and applicable herein, which is that the erroneous admission of testimony is not cause for reversal if the same fact is proven by other testimony not objected to. Wagner v. State, 53 Tex. Cr. R. 307, 109 S. W. 169; Bailey v. State, 69 Tex. Cr. R. 484, 155 S. W. 536; Christie v. State, 69 Tex. Cr. R. 602, 155 S. W. 541; Tinker v. State, 179 S. W. 573, and cases cited. I do not mean to intimate that any of said testimony elicited by the state was inadmissible. I think all of it was admissible.

Appellant complains that the court erred in refusing to give two special charges which he requested. One of these was that the jury must believe beyond a reasonable doubt that appellant penetrated Viola, "independent of any confession by him." That is not the law. Kugadt v. State, 38 Tex. Cr. R. 694, 44 S. W. 989; Ingram v. State, 182 S. W. 290.

The other was, they must not consider his admissions before the grand jury unless they believe beyond a reasonable doubt said admissions were freely and voluntarily made. The evidence did not raise such an issue. He made no such intimation when before the grand jury at either time. However, there is nothing in either charge or bill which shows that they were presented to the judge before he read his charge to the jury. The bills each simply give the style, number of the cause, court, etc. Then that he requested the court to give the following charge, quot-

ing it. At the bottom of it is, "Refused," and the judge's name signed. More than two months after the court adjourned, appellant prepared, and the court then allowed, a bill stating that he requested the said respective charges and the court refused them, to which he excepted. In the first of them no reason is even then given, nor the facts stated on which it is claimed such charge ought to have been given. In the other, a brief statement of some of the testimony is given, on which he claims he based his request for said charge; but in neither of these bills does he show that these matters were presented to the judge at the time or under the circumstances required by the new amended statute on the subject. The main object the recent law had in requiring parties to object to the court's charge and request additional charges before the judge reads his charge to the jury was that all such matters should then be called to the attention of the court specifically so that the court could then pass upon them, and not wait, as had theretofore been the law, until after the trial to present such matters to the trial judge. Since the new law on the subject, this court has uniformly, in a large number of cases, held that it could not, and would not, review such questions unless the bills and record show that they were thus presented to the judge in proper time. Ross v. State, 170 S. W. 306; Guiterrez v. State, 170 S. W. 717; Watts v. State, 171 S. W. 204. See, also, Byrd v. State, 69 Tex. Cr. R. 41, 151 S. W. 1068; Ryan v. State, 64 Tex. Cr. R. 637, 142 S. W. 878. It is needless to collate the many decisions on this subject. However, in my opinion, neither of said charges should have been given.

As shown above, whether or not appellant had sexual intercourse with his daughter Viola was a disputed question. If the jury had believed the testimony offered by the defendant, they would have acquitted him. On the other hand, I think the facts and circumstances in connection with his admissions were sufficient to justify the jury to convict him. Evidently they believed the facts and circumstances on behalf of the state.

In my opinion the judgment should be affirmed, not reversed.