## Boreing, et al. v. Garrard, et al.

(Decided May 19, 1925.)

## Appeal from Clay Circuit Court.

1. Quieting Title—Plaintiff Must Allege and Prove Both Title and Possession, where no Counterclaim Set Up.—In action to quiet title under Ky. Stats., section 11, where defendants did not set up any counterclaim asking for affirmative relief, plaintiff must allege, and, if denied, prove, both title and possession.

2. Evidence—History and Geography of State Judicially Noticed.— Court of Appeals of Kentucky takes judicial knowledge of history and geography of state.

3. Evidence—Judicially Noticed That City of Pineville Built on Cumberland River at Point where Wilderness Road Crossed River.—It being a matter of history that Wilderness road crossed Cumberland river at particular point, court will judicially notice that city of Pineville, in Bell county, is built at point where such road crossed the river.

4. Quieting Title—Evidence Held to Locate Old Grant Under which Defendants Claim.—In action to quiet title, in which defendants claimed title under an old grant describing land by reference to first creek emptying into Cumberland river about "Settlement Road," evidence and facts of history and geography, of which court takes judicial notice, held to show that Wilderness road and Straight creek were road and creek referred to.

5. Adverse Possession—Possession by Tenants of Small Tracts Held Insufficient to Give Landlord Possession of Entire Boundary.— Possession by tenants by sufferance or at will of small portions of land claimed by landlord under junior grants held insuf-.ficient to give landlord possession of entire boundary claimed.

W. B. DIXON for appellants.

JAMES H. JEFFRIES, CLIFFORD B. LONGLEY, and CLEON K. CALVERT for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

The appellants herein, who are the heirs at law of Judge Vincent Boreing, deceased, formerly a member of Congress from the eleventh district of Kentucky, instituted this equitable action in the Clay circuit court alleging themselves to be the owners of the legal title and in the actual possession of a tract of land of some 1,600 acres, described by metes and bounds, and for relief they sought to have their title quieted of the claims of the appellees, W. T. Garrard, E. T. Garrard and Kentucky

River Timber & Coal Company, a corporation. By the petition the history and derivation of their title was given. The appellees by answer denied that appellants either owned the title to the land in question or that they were in possession of it. Affirmatively they pleaded that they were the owners of the land in question and were in actual possession of it.

However, the answer was neither styled a counterclaim nor did it by way of counterclaim ask any affirmative relief, the prayer being merely that the petition be dismissed.

In that state of case, as was said by this court in Southern Oil Co. v. Holman, et al., 196 Ky. 250:

"Under section 11 of Kentucky Statutes, which authorizes an action such as this to quiet title, the plaintiff must allege, and if denied, prove both title and possession, unless the defendant elects to try title by pleading his own and asking by way of counterclaim that it be quieted. Fox v. Cornett, 124 Ky. 139; Johnson v. Farris, 140 Ky. 435; Hall v. Hall, 149 Ky. 817, 149 S. W. 1127; Cumberland Co. v. Kelly, 156 Ky. 397, 160 S. W. 1077; Sackett v. Jeffries, 182 Ky. 696, 207 S. W. 454; Childers v. York, 187 Ky. 332, 218 S. W. 1027; Frasure v. Northern Coal & Coke Co., 189 Ky. 574, 225 S. W. 479."

It appears from the record herein that in the year 1888 Vincent Boreing purchased from and there was conveyed to him by Nancy C. Potter and her husband 15 tracts of land, the deed of conveyance describing the 15 tracts separately. Those 15 tracts consisted of the Mollie Grubb patent of 50 acres, the Mason Jackson patent of 50 acres, a part of the Isaac Grubb patent of 150 acres and 12 patents in the name of Barton Potter, the areas of which differ, none being for more than 200 acres. Appellants contend that those 15 tracts of land adjoin each other and that their common boundary is as set forth and described in the petition. The record disclosed a connected chain of title from the patentees above mentioned to Vincent Boreing, the ancestor of appellants herein.

Appellees claim the title of the lands in controversy under a survey made for and grant issued to Benjamin Say for 90,000 acres of land, the survey having been made August 30, 1785, and the patent having issued April 15, 1788. It is contended for them that the Benjamin Say

grant properly located covers and embraces all the lands claimed by appellants in their petition. They urge that since the land in controversy had been appropriated and granted to Benjamin Say in 1788 it was not vacant and unappropriated land at the time the entries and surveys were made and the patents issued to the remote grantors of Vincent Boreing; that the grants under which appellants claim are junior patents and therefore void. They contend that for that reason appellants failed to manifest their right to recover herein and that the chancellor properly dismissed their petition.

Appellants contend that if it should be conceded that the Benjamin Say 90,000 acre grant when properly located embraces the land in controversy, yet that they and those under whom they claim under the junior grants took actual possession and held all the lands covered by them in actual possession for a sufficient length of time to have acquired title. The pleadings properly made the issues on those questions.

As indicated above, upon the trial of the case in the court below the chancellor dismissed appellants' petition and this appeal is prosecuted from that judgment.

We may briefly summarize the questions presented by the appeal as follows: (1) Does the Benjamin Say 90,000 acre grant when properly located cover and embrace the lands mentioned and described in appellants' petition? (2) If so, have appellants manifested their right to hold the lands claimed by them herein by adverse possession under the junior grants?

(1) The copy of the Benjamin Say survey found in the record describes it as 90,000 acres in Lincoln county of what was then the state of Virginia, "situate on the waters of Cumberland river and about 3 or 4 miles therefrom on the north side, beginning at three sugar trees growing from one root on the bank of the west fork of the first creek that empties into Cumberland river above where the settlement road crosses, being about one mile above the fork of the creek and about 3 or 4 miles from the mouth thereof, running thence north 40 west 3,840 poles to a red oak and 2 dogwoods on the top of a dividing ridge; thence north 50 east 4,491 2/3 poles to a poplar, red oak and dogwood on the side of a hill; thence south 40 east 3,840 poles to 3 red oaks; thence south 50 west 4,491 2/3 poles to the beginning." It thus appears that the 90,000 acre tract of land is a parallelogram and

that the short lines of its boundary are exactly 12 miles long. It appears from the survey and patent that there was excluded from the boundary above given 17,800 acres previously entered; 7,200 acres of which had previously been entered in the name of Boswell Goodman. 6,600 acres in the name of George Thompson, and 4,000 acres in the name of Abraham Buford. The exclusion likewise is a parallelogram and its beginning corner as recited by the survey begins on its first line 1,600 poles from the beginning corner, and the description of the exclusion is given by metes and bounds. The map found in the record showing the location of the Benjamin Say 90,000 acre grant as contended for by appellees shows all the land in controversy to lie within that survey. The correct location of that survey is made to depend, as the case is presented for the appellees, upon the descriptive portion of the survey showing the location of the beginning corner, and especially the reference therein made to the point on Cumberland river "where the settlement road crosses." If that point may be located, then the location of the beginning corner of the 90,000 acre grant can be established beyond question. As recited by the survey the beginning corner was three sugar trees growing from one root. They stood on the bank of the west fork of the first creek that empties into Cumberland river from the north above "where the settlement road crosses" and about one mile from the fork of the creek and about three or four miles from its mouth. No one contends that any of the trees originally marked as the monuments denoting the corners of this survey are yet standing. B. F. Johnson, one of the surveyors who made the location for appellees, testified that a number of years ago he had pointed out to him on the bank of the left or west fork of Straight creek in Bell county, Kentucky, the reputed beginning corner of the Benjamin Say grant, and he testified that at that time the roots of sugar trees were to be found at that point. He made that point the beginning corner of the survey as located by him and as shown by the maps prepared and filed with his deposition in this case. The testimony as to sugar tree roots appearing there of course carries very little, if any, probative value. If, however, Straight creek is the first creek that flows into Cumberland river from the north above where the "settlement road," mentioned by the surveyor who made the original survey, crosses Cumber-

land river, then his location of the beginning corner of the Benjamin Say grant is as near correct as can now be ascertained. The point made the beginning corner by him is approximately one mile from the forks of that creek, one mile and 30 poles to be exact, and on its west fork thus fitting the description given in the original survey. If, for failure to find the monument marking the beginning corner, we should hold the correct location of the beginning corner to be exactly one mile from the forks of the creek, that change in the location would not affect the question involved here because a change of 30 poles in the location of the beginning corner would not so change the position of the 90,000 acre survey as to exclude from it any of the land in controversy. The question to determine is whether or not Straight creek is the first creek that flows into Cumberland river from the north above where the ''settlement road'' mentioned in the original survey crossed Cumberland river.

It is contended for appellees that the settlement road mentioned in the original grant was the old immigrant trail to Kentucky known to history as the ''Wilderness road.'' They contend that the trail or road crossed Cumberland river at only one point and that the city of Pineville is now located at the old ford where the Wilderness road crossed Cumberland river. The evidence discloses that Straight creek empties into Cumberland river about one-eighth of a mile above that old ford or crossing; that it is the first creek that flows into the river above that crossing; that it forks into a west and east fork so as to fit the description given in the survey and that the beginning corner as located for them is on the left or the west prong of the creek about one mile from the fork. The first line of that survey as run for appellees from the beginning corner as located by them when projected on the course given and run its distance, according to the testimony of the surveyors, though 12 miles in length, terminated only 19 poles beyond the top of a well defined dividing ridge between two creeks. The corner at the end of the first line of the survey as described in the original survey was a red oak and two dogwoods on the top of a dividing ridge. That fact established by the testimony and not contradicted tends to establish as correct the location of the survey as made for and contended by appellees herein. The first line of the survey as located by appellees' surveyors crossed Stinking creek at a little over half its distance, approxi-

mately seven miles from the beginning corner. Stinking creek, as laid down on the map prepared for appellees herein, crossed the southern line of the survey about the center of the 17,800 acre exclusion. In other words, the location of the Say grant as made for appellees locates the 17,800 acre exclusion on the ground so that Stinking creek traverses it from north to south, crossing its southern line about midway. As above noted, the 17,-800 acre exclusion consisted in part of the Boswell Goodman tract of 7,200 acres. We find that the Goodman survey and grant describes its lands as lying on Stinking creek. That fact and the fact that the location of the 90,-000 acre tract as made for appellees herein places Stinking creek within the 17,800 acres excluded are facts of great probative force and value, tending to establish that the location of the Benjamin Say 90,000 acre grant as made for and contended by appellees is correct, if indeed not conclusive.

This court takes judicial knowledge of the history and geography of the state of Kentucky. From history we know that in 1785, when the Benjamin Say survey was made, portions of our state had attracted our pioneer homeseekers. Settlements then existed in central Kentucky. Lexington had then been founded and enjoyed organized government under a charter. There were settlements at Boonesboro, Harrodsburg (then known as Harrodstown), Danville and other points. Farther west Louisville had been established and was building the foundation for her future greatness; Bardstown had come into being, as well as other villages. From history we know that all immigration to Kentucky came over one of two routes. That from Pennsylvania and other points north and east came into Kentucky down the Ohio river, while the immigration from Virginia and the Carolinas came over the wilderness road through Cumberland Gap. That road, an old buffalo trail, utilized by the Indians as a part of one of their numerous "warriors' paths" into and through Kentucky, crossed Cumberland river at the only available ford in all that country. The city of Pineville, in Bell county, is located on the river now where the Wilderness road crossed. The Cumberland river crossing was one of the points almost universally noted and commented upon in the diaries and journals of the early explorers of and immigrants to Kentucky from which the details of our state's earliest history have been taken. The next point on the Wilderness road after

crossing the river given notice by the early explorers was "Flat Lick." The village by that name, now in Knox county and about half-way between Pineville and Barbourville, occupies its site. From Cumberland Gap to Flat Lick the old Buffalo trail, one of the Indian warrior's paths and the Wilderness road were over the same route. At Flat Lick the immigrant trail to Kentucky, the Wilderness road, diverged to the west, passing through Blue Lick and thence to Boonesboro, while from Flat Lick the "warriors' path" diverged to the north and traversed the state to the Ohio river at old Shawneetown. In preparing this opinion we have had access to the first map of Kentucky made by John Filson and published in 1784. It lays down the Wilderness Road from Virginia into Kentucky through Cumberland Gap and shows that road to have crossed Cumberland river some eight miles above the mouth of Stinking creek, that creek being located on the map and being given that name. By an inscription found upon the map its author acknowledges and expresses his gratutude for the assistance rendered him in its preparation by such early distinguished Kentuckians as Daniel Boone, Levi Todd, James Harrod, Captain Christopher Greenhoop, In. Cowan and William Kennedy. The location of Flat Lick is shown on the map. Two other early maps of Kentucky —that by J. Russell made in 1794 and that by Elihu Baker made in 1795—likewise lay down the Wilderness road into Kentucky as it ran through Cumberland Gap and across Cumberland river, locating it with reference to Flat Lick and Stinking creek as did the Filson map. The location of the point where the Wilderness road crossed Cumberland river is a matter of history, and we judicially know that the city of Pineville, in Bell county, is built on the Cumberland river at the point where that road crossed the river. We find from the record herein that Straight creek is the first creek that empties into Cumberland river from the north above where the Wilderness road crossed. That road might properly have been referred to in 1785 as the "settlement road" because it was the one road leading from the civilization of Virginia and the Carolinas through the mountains of eastern Kentucky to the settlements then founded in the latter territory. Straight creek forks about two miles from its mouth into a west and an east fork. The beginning corner of the Say 90,000 acre grant was located for appellees one mile and 30 poles from the

forks of that creek on the west prong of the creek. So
that as located for appellees the beginning corner stands
on the bank of the west fork of the first creek that
empties into Cumberland river from the north above
where a road crossed the river in 1785 that then prop-
erly could be referred to as the "settlement road," the
beginning corner being about one mile—a mile and 30
poles to be exact—from the forks of the creek and about
three or four miles from its mouth. When we consider
those facts found from the evidence herein, in connec-
tion with the description contained in the survey and
patent of the Benjamin Say 90,000 acre tract, it is man-
ifest that appellees have so located the beginning corner
of that survey as exactly to fit the description given in
the original survey. Considering those facts and the
additional facts heretofore mentioned, that is, that from
the beginning corner as located for appellees the south-
ern or first line of the survey projected on its course
crosses Stinking creek at approximately seven miles, and
terminates on a dividing ridge; that the original survey
and plat, together with the tracts composing the 17,800
acre exclusion, likewise make the first or southern line
of the 90,000 acre tract to cross Stinking creek at ap-
proximately seven miles and to terminate on a dividing
ridge; and that the earliest maps of Kentucky locate
Stinking creek and the point where the "Wilderness
road" crosses Cumberland river with reference to each
other so as exactly to correspond with the facts above,
we are left in no doubt as to what road the surveyor had
reference to when in describing the location of the be-
ginning of the 90,000 acre Say grant he spoke of "where
the settlement road" crossed Cumberland river. Be-
yond question the language just quoted had reference
to the buffalo trail and Indian "warriors' path" through
Cumberland Gap that crossed the river where the city
of Pineville is now located, utilized by the early explor-
ers and pioneer settlers that came into Kentucky from
Virginia and the Carolinas, the road known to history
as the "Wilderness road." We conclude from the facts
developed in evidence and from the facts of the history
and geography of our state, of which we take judicial
knowledge, that the appellees have correctly located the
Benjamin Say 90,000 acre grant and that it covers the
tract of land described in appellants' petition herein.

(2)    It then becomes necessary to ascertain whether
or not the appellants and those under whom they claim,

since they claim under junior grants, took such actual possession as is required by law and continued in that character of possession for the time required by law to manifest their right to hold the lands in controversy under the junior grants. We find that question to be comparatively easy of solution since appellants' claim to possession all relates to the possession of the lands in question by John Taylor and Buck Grubb as tenants of Vincent Boreing. The testimony of both John Taylor and Buck Grubb is found in the record, and necessarily no stronger testimony of their possession and the character of their possession could be found in the record than that of those two witnesses. After having purchased the 15 tracts of land Vincent Boreing had a survey of same made, the exact date of the survey not appearing. At that time it does not appear that anyone was living upon any of those tracts of land or that anyone had lived upon any of them. Neither does it appear that the entire boundary or any of it was or had been enclosed. From the testimony of John Taylor it appears that about 1902 he moved into a residence upon a tract of land belonging to his father-in-law that lays just south of the Polly Grubb grant, one of the tracts composing the Boreing lands. He afterwards purchased that tract of land from his father-in-law and lived on it some six or eight years. While living upon that tract of land he enclosed a small field around his dwelling. After having fenced it he learned from some source that he had perhaps enclosed in his field a small portion of the Polly Grubb survey claimed by Vincent Boreing. About the same time he enclosed another small clearing of approximately two acres that lay entirely within the Mason Jackson tract, one of the 15 tracts purchased by Vincent Boreing. Some time after he had enclosed that small portion of the lands claimed by Boreing he had a conversation with him and undertook to purchase it. Boreing declined to sell to him, but according to the statements of Taylor told him that he might continue to use the land until he called for it. It appears from Taylor's testimony that in the one or more conversations had with Boreing about the matter Boreing told him not to cut any of his valuable timber and not to permit anyone else to do so. That is the effect of all of Taylor's testimony as to his connection with the Boreing land. It appears that about 1908 Taylor moved from his home south of the Polly Grubb tract to another tract

of land he had purchased that lies northeast of the lands claimed by appellants herein. Vincent Boreing died before Taylor moved to the latter location. While living at the latter place Taylor in fencing his lands crossed into the Boreing land and enclosed with his lands another small portion of the Boreing land.

The location of the Polly Grubb grant which constitutes a part of the Boreing lands as made for appellants herein discloses that Buck Grubb resides and has resided for many years within the lines of that survey. There is a controversy as to whether or not appellants have correctly located the Polly Grubb survey, and appellees contend that when properly located that survey will not include within its lines the Buck Grubb residence. However, we deem it unnecessary to determine the question as to whether the location of that survey as contended by appellants or that as contended by appellees is correct. The testimony of the witness Buck Grubb establishes beyond all question that he had held and claimed as his own the lands surrounding his residence and which are enclosed with a fence through all the years that he has lived there, and not as the tenant of Vincent Boreing and his heirs. However, it appears from his testimony that about 1903 he obtained permission from Vincent Boreing to use about an acre and a half of the land then claimed by Boreing lying within the lines of the Isaac Grubb tract and that he then fenced it and has used it ever since, recognizing the right of the Boreings to call for it. His possession of any of the Boreing land, however, according to his own testimony, has been confined solely to that small portion of the Isaac Grubb tract. Appellants insist that by virtue of the tenancy of John Taylor and Buck Grubb, created and continued as above indicated, and through their possession, Vincent Boreing in 1903 acquired actual possession of the entire 1,600 acres of land embraced in the 15 tracts conveyed to him by the Potter deed, and that they have remained in the actual possession of all of same through the tenancy of Taylor and Grubb ever since. If it should be conceded that appellants have properly located the lines of the Polly Grubb survey and that when it is properly located it touches the Isaac Grubb survey and thereby renders the 15 tracts purchased by Vincent Boreing contiguous tracts of land susceptible of being thrown into one common boundary, the evidence discloses beyond question that Buck Grubb,

one of the two witnesses shown to have resided within the lines of the Polly Grubb survey, held possession of that portion of it on which he did reside, not as the tenant of Vincent Boreing, but claiming the land on which he resided as his own, and his possession within the lines of the Polly Grubb survey was confined to his close which surrounded his residence, all of which he claimed to own and held as his own. The portion of the Boreing lands which he enclosed with the permission of Vincent Boreing was apart from his own tract, and his possession there, according to his own testimony, was confined solely to the small tract containing about an acre and a half which he enclosed with the fence. The other witness, John Taylor, through whose tenancy appellants claim to have been in actual possession of all the lands described in their petition from 1902 down to the present time, appears from the testimony never to have resided upon any of the Boreing lands, even according to the survey as located for appellants. While living south of the Boreing lands on lands belonging to his father-in-law he enclosed with the tract on which he lived a small portion of the Boreing land consisting of an acre or two by extending his fence so as to include it. He enclosed with a fence about two acres of the Boreing land at another place and about a quarter of a mile from his home. Both of those enclosures were made by him without permission from or the knowledge of Boreing. Afterwards Boreing gave him permission to hold the lands he had so enclosed until called for by him and refused to sell them to him. When he moved to the tract subsequently purchased by him northeast of the Boreing lands without the knowledge or consent of Vincent Boreing's heirs, the appellants herein, he enclosed with his lands another small portion of the Boreing lands. That was about the year 1908. Those facts and those facts alone, except the further fact testified to by that witness that Boreing directed him not to cut and sell any of his valuable timber or to permit anyone else to do so, are relied upon by appellants as constituting for them through their tenants, Grubb and Taylor, actual possession of the 15 tracts of land composing an entire boundary of approximately 1,600 acres, within the law for a sufficient length of time to ripen their holding under the junior grants into perfect titles. The court is of the opinion that the facts baldly stated as above speak for themselves. The possession of Taylor

and Grubb was confined to the exceedingly small tracts of land within the Boreing boundary that they enclosed with a fence and which according to their testimony Vincent Boreing permitted them to hold as tenants by sufferance or at will. There is no method known to the law whereby the possession of the witnesses Taylor and Grubb of the small tracts of land which they enclosed and held as tenants by the sufferance of Vincent Boreing can be enlarged so as to extend to the confines of the 1,600 acre boundary of land described in appellants' petition. Possession in no other way is shown by the record.

It, therefore, follows that appellants wholly failed to establish either that they own the title to or that they were in possession of the tract of land mentioned and described in their petition and, therefore, the chancellor properly dismissed the same.

The judgment is affirmed.