# Pond Creek Coal Company v. Hatfield et al.

(Decided February 8, 1929.)

(As Modified, on Denial of Rehearing, May 3, 1929.)

HARMAN, FRANCIS & HOBSON for appellant.

W. K. STEELE, J. E. CHILDERS and E. J. PICKLESIMER for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

This suit was brought by the appellant against the appellees to quiet its claimed title to a described boundary of land. By a counterclaim the appellees asserted title in themselves, and prayed that it be quieted. On final hearing the trial court adjudged title by adverse possession in the appellees, and dismissed the appellant's petition. From that judgment, this appeal is prosecuted.

On December 4, 1866, the commonwealth issued a patent covering 5,040 acres of land in Pike county to Richard Phillips, John Dils, and John Goosling. It was a blanket patent, and by its terms there was excluded from it 2,000 acres of land covered by prior patents. The appellant claims to own through mesne conveyances the

land included in this patent. In 1845 there was issued to Ephriam Hatfield a patent for 50 acres of land lying near the headwaters of the left fork of Blackberry creek and in 1857 he procured another patent for 100 acres of land adjoining and possibly overlapping the 50-acre patent he had already secured. These two tracts are a part of the exclusion of the Phillips, Dils, Goosling patent. Ephraim Hatfield had a son, James Hatfield, who is called, in this record, Major Jim. By his first marriage Major Jim had a daughter, who married L. D. Canada, and the couple lived with Major Jim on one of the Ephriam Hatfield patents as long as Major Jim's first wife lived. After her death Major Jim remarried, and his daughter and her husband moved to the other of the Ephriam Hatfield tracts. In later years, after Mrs. Canada had died, Ephriam Hatfield, by agreement, made a deed to this latter tract to L. D. Canada for life, with remainder in fee to his son. This tract has come into the ownership of the appellees. Ephriam Hatfield also made a deed to Major Jim Hatfield for the other of the Ephriam Hatfield patents, and on which Major Jim had continued to live after his daughter and her husband, Canada, had left his household.

The descriptions of the two Ephriam Hatfield patents, both of which lay along the left fork of Blackberry creek, did not extend up to the top of the ridges which ran around the headwaters of this stream. Indeed, they did not cover so much of the land as lay on either side of the creek as the appellant now concedes to belong to appellees. This extension of the boundaries arose from a mineral deed which was made by the appellees' predecessor in title of the Ephriam patents to the predecessor in title of the appellant, and which described a larger boundary than that contained within the descriptions of the Ephriam Hatfield patents. However, even the mineral deed does not extend up the hillsides to the top of the ridges running around the headwaters of the left fork of Blackberry creek. The land here in dispute is that which lies around the mineral deed and between its boundaries and the top of the mentioned ridges. In 1887 or 1888, the record not being entirely clear as to which year it was, Major Jim Hatfield attempted to extend the boundaries of his patent to the top of these ridges so as to include the land here in dispute by surveying and marking out a boundary running around the top of the ridges.

In their petition for a rehearing, counsel for appellees challenge the statement that this boundary was marked by Major Jim Hatfield in the year 1887 or 1888 and inquire where the court got those dates. In response, it must be said that at the best only an approximation can be given from the evidence in this record as to the time when Major Jim Hatfield did mark this boundary. Even learned counsel for appellees, when they wrote their original brief in this case, labored under that handicap. Indeed, at that time they were unable to spell out of the record an earlier date than 1889 for the marking of this boundary. We quote from that brief:

"The evidence shows that in the year 1889 Major James Hatfield and his father employed a surveyor, Grant Johnson, and had said surveyor, aided by several other parties, some of whom testified in this case, mark out each of them a boundary, . . . . and the boundary thus marked out at said time . . . is the land in controversy in this case."

The placing of the marking of this boundary in 1889 by counsel for the appellees in this excerpt from their brief was no mere inadvertence, for time and again in that brief they refer to that year as the one in which Major Jim Hatfield marked this boundary.

Applying ourselves again to this question of when this boundary was marked, we find that the witness Canada says that it was marked out three or four years before Wallace Williamson came there, ran the lines of the Phillips-Dils-Goosling patent, and took some deeds. The earliest of such deeds found in this record bears date 1892. There is also evidence to the effect that, when Major Jim joined with his father in what is known in this record as the mineral deed, he attempted to convey the minerals under all the land which he was then claiming. This mineral deed bears date 1889, and does not cover the land here in dispute. True it is that the witness Joe Hatfield, testifying on April 22, 1920, stated that this boundary was marked out 35 years before the giving of his testimony; but, even if we take the evidence of this witness to the exclusion of the other testimony in this case tending to show a later date, the 15 years would not have expired until April, 1900, and appellee's tenant, D. J. Dotson, by whose tenancy the adverse possession, if it ever started to run, and had not been theretofore interrupted, was as least broken, as we shall more fully

discuss later on in this opinion, took charge of the demised premises March 13, 1900. The witness Jake Hatfield's testimony as to the time when this line was run rests on what he said Major Jim told him—incompetent testimony, to which proper objection was taken. He was asked if he had himself walked around this line *about* 35 years ago, and he said: ''Yes, that or over.'' But the expression ''about 35 years'' fixes no definite date nor was the answer any more definite. Without further elaborating this point, it may be said that the fairest approximation to the time when Major Jim Hatfield ran this line which can be made from this record is that heretofore stated, 1887 or 1888. At least this can be said: The best witness the appellees had, Joe Hatfield, did not put the time back quite far enough, as that the adverse possession, if any, was not broken by Dotson's occupation, as we shall presently discuss. Appellees say, though, that the evidence shows that Major Jim Hatfield marked this boundary the day after the boundary was marked by a relative of his about another tract of land, which was in controversy in the case of Lawson, Trustee, v. Hatfield, 145 Ky. 779, 141 S. W. 36, wherein it was held that the finding of the jury in an action of ejectment that the appellee had established that he had a title to such tract by adverse possession had evidence to support it. However, so far as the instant case is concerned, the evidence as to when the tract of land involved in the Lawson case was marked is no stronger or more definite than that as to when Major Jim marked his boundary as hereinbefore discussed. We cannot determine the issues raised in this case by what may have been proved in some other case, but are bound by the evidence herein adduced. The Lawson case, then, affords no help in solving this question of time we have under consideration.

There is some dispute in the record as to how well Major Jim marked this boundary, but whether we adopt the view that the findings of the chancellor in this case are to be regarded as those of a properly instructed jury, or are only to be regarded as findings in equity cases usually are, a question we shall presently discuss and decide, the finding of the chancellor, that the boundary was a well-marked one, must be upheld. Major Jim was then living on one of the Ephriam Hatfield patents, and, for the purpose of this case, it may be conceded that the character of his possession of the land, included within

the boundary he had marked on the top of the ridges, was such during the remainder of his life after he had marked that boundary as that, if he had lived and it had continued for 15 years, title to the disputed land would have ripened in him by adverse possession. However, it will be noted that the 15 years necessary for that purpose did not expire until the year 1902 or 1903, or possibly April, 1900, if we accept as final the evidence of appellees' witness Joe Hatfield. Major Jim Hatfield died about the year 1894, leaving surviving him as his only heirs and distributees at law his widow, Sarah Ann, and three children, Laura, Albert, and Nancy, the oldest of whom was then 12 years old and the youngest 3.

The widow was appointed administratrix of her husband's estate. Either by virtue of a contract made by Major Jim in his lifetime or by his widow as the administratrix of her husband's estate, the record not being clear as to which, some timber was sold off the lands owned by Major Jim at the time of his death, and the purchaser, in cutting the timber pointed out to him as the timber he had bought, cut quite a few trees off the lands here in dispute. Appellant's predecessor in title thereupon brought suit against the administratrix for damages for the trees thus cut. She confessed the claim of the plaintiff in that suit, and compromised it by paying the sum of $105. The children of Major Jim, however, were not parties to that suit. A little over a year after Major Jim died his widow married Jordan Dotson, and she and her children went to live with him at the mouth of Calloway fork of Peter creek, some five or six miles away from this land in dispute. It was not long after their removal to the home of Jordan Dotson that the house on the Ephriam Hatfield patent, and in which they had lived, burned. Whether or not Sarah Ann and her children continuously had a tenant on the Ephriam Hatfield patents who were exercising possession over the disputed lands to the top of the ridges from the time they left up to the year 1900, as appellees insist the evidence shows, and appellant insists it does not show, we need not stop to inquire.

Both sides to this suit agree that in the year 1900, D. J. Dotson was put upon the Ephriam Hatfield patents as the tenant of the appellees herein, and that he lived there as such tenant for 8 years. After he left, his son continued to occupy the premises for another year and then there was a break in its occupancy until Mose

Kinder, as the tenant of Sarah Ann and her children, went to live on the Ephriam Hatfield patents in February, 1911. He lived there 8 years. During his term, Sarah Ann and her children deeded the Ephriam Hatfield patents and the land in dispute to Geo. H. Coleman. He testified that he knew that the grantors did not own the land in dispute, but he directed the deed to be made to read so as to include it in order that, if he could hold such land long enough, he would get title to it. Very shortly after taking his deed, Coleman became dissatisfied with his bargain, and he deeded the land back to Sarah Ann, Albert, and Nancy, Laura not being included as grantee, the deed containing the same description as appeared in his deed. Sarah Ann, Albert, and Nancy, together with Nancy's husband, are the present appellees. Laura was sued also, but she made no defense to this action, as whatever interest she had in the property passed to the appellees by virtue of the Coleman deed above referred to.

Referring back to the tenancy of D. J. Dotson which began in 1900, we find that he testified in this case to the effect that, when he was put in possession of the leased premises, as the tenant of the appellees, by Sarah Ann and her husband who were managing this estate for the children, she and her husband pointed out to him the lands of the Ephriam Hatfield patents as they were understood to be in the light of the mineral deed, and warned him not to get over their boundaries onto the lands here in dispute, and that during the period of his tenancy he did not take or exercise any possession of such lands except for a very small lot which, through mistake, he fenced in as a part of the Ephriam Hatfield patents, and that he never claimed any possession or right to possession or ownership of the lands to the top of the ridges. During this period none of the appellees lived upon the land, or were in actual possession of it. The only possession they had of the lands in dispute was such possession as their tenant, D. J. Dotson, had. As seen he had no possession, and claimed no possession of the land lying outside the Ephriam Hatfield patents, or at least the boundaries of the mineral deed, except a very small acreage which he had fenced in as above stated. It follows that at least in March of the year 1900 the running of the 15-year statute of limitations (Ky. stats., sec. 2505) was interrupted, if it had not been so theretofore, and that it did not start running

again at least until Dotson moved from the premises at the end of the year 1908. See Boreing v. Garrard, 210 Ky. 135, 275 S. W. 374; Interstate Investment Co. v. Bailey, 93 S. W. 578, 29 Ky. Law Rep. 468. As this suit was brought in February, 1920, the 15-year statute could not have run again, conceding for the nonce that, from 1908 on, the appellees by themselves or their tenants had adverse possession of the disputed lands, a fact which we shall presently see is not borne out by the record.

It is true that the appellees testified that during all of the period from the death of Major Jim up to the filing of this suit they were in possession of the disputed lands, either by themselves, or by a tenant. Although this testimony was explained away by the testimony of at least one of the tenants himself, D. J. Dotson, appellees insist that, had this case been tried by a jury, such testimony would have been sufficient to sustain a verdict of the jury in their favor on the issue of adverse possession, if the jury had been properly instructed, and that, as this suit was under the issues properly a case in ejectment, the decision of the chancellor should carry the same weight as the verdict of a properly instructed jury. They cite the case of Perry v. Eagle Coal Co., 170 Ky. 824, 186 S. W. 875, in support of their position. In reading the statement of the case, it will be noted that the title to the land there in dispute had been theretofore litigated between Perry and the predecessor in title of the Eagle Coal Company. The title to the land with a slight exception had been awarded to such predecessor in title, and the case reversed with instructions to ascertain that exception. After it had been ascertained, Perry declined to yield up possession, and the Eagle Coal Company brought suit to secure such possession. Incidentally it asked that its title be quieted, but the real purpose of the suit was to recover possession, and hence the action was in truth an action in ejectment and not an action to quiet title. The present case was not brought primarily to recover possession of the disputed lands. It was an action to quiet title, and as such it was an equitable action. Its character as such was not destroyed, because the appellees by their counterclaim, asserting title in themselves and asking that it be quieted, relieved the appellant of proving possession in itself in order to maintain its action under section 11 of the Statutes. Hence the findings of the chancellor are

entitled to no more weight than the findings of the chancellor in any equitable action. Cf. Bishop v. Roberts, 179 Ky. 169, 200 S. W. 363; McCain v. Joiner, 151 Ky. 198, 151 S. W. 406; Tabor v. Tabor, 213 Ky. 309, 280 S. W. 136; Louisville Property Co. v. Rose, 184 Ky. 221, 211 S. W. 743. This being true, we are of the opinion that the evidence does not sustain the finding of the chancellor, that title by adverse possession had ripened in the appellees, but that, on the contrary, the great weight of the evidence, if not the overwhelming weight of it, is to the effect that the running of the statute was at least interrupted when D. J. Dotson entered into the possession of the Ephriam Hatfield patents or the land covered by the mineral deed in 1900, and that the period, from the time when he moved out in 1908 until this suit was brought, was too short to vest any title in the appellees by adverse possession, even had the character of their possession during that period been of the requisite nature.

Appellees insist, however, that, even if they did not establish title by adverse possession in themselves, yet, as some mesne conveyances made in 1911 to appellant's predecessor in title were executed at a time when the appellees by their tenant, Mose Kinder, was in possession of the disputed land, such deeds were champertous, and appellant's claim of title fails. We have read the evidence of Mose Kinder most carefully, and, with the exception of a sporadic cutting of some chestnut timber on the disputed lands, we cannot find where he exercised any possession or claimed any possession of any land beyond the boundaries of the mineral deed, except as to the small acreage under fence we have heretofore mentioned. Hence, with the exception of this small acreage, the deeds in question were not champertous. Kentucky Union Co. v. Hevner, 210 Ky. 121, 275 S. W. 513. As to the small acreage, the evidence does show that Kinder cleaned it up and fenced it in, and that the agent of the appellant's predecessor in title knew of Kinder's possession of this lot, and that he had such possession in 1911 when the challenged deeds were executed. To the extent of this small acreage, the deeds were champertous, and title to it did not pass to the appellant's predecessor in title. But they were champertous only to that extent. See Altemus v. Nickell, 115 Ky. 506, 74 S. W. 221, 24 Ky. Law Rep. 2401, 103 Am. St. Rep. 333.

In their petition for rehearing appellees for the first time take the position that six deeds in appellant's chain of title made between the years 1889 and 1894 were champertous, and that, this being so, appellant's title fails, for which reason the judgment of the lower court is correct. The Phillips-Dils-Goosling patent, under which the appellant claims, was dated December 4, 1866. Phillips and Goosling, by deed dated September, 1871, conveyed their two-thirds interest in this patent to Benjamin Williamson, Sr., who died some time before 1884, leaving a number of heirs, to whom the property in question descended. Four of the six deeds which it is now claimed were champertous—being those of Hiram H. Williamson to Floyd E. Williamson, of date June 27, 1889; Floyd E. Williamson to Benjamin M. Williamson, of date June 27, 1889; Benjamin M. Williamson to Wallace J. Williamson, of date March 8, 1892; and Easter Williamson to Wallace Williamson, of date April 28, 1894—were conveyances between those who had inherited this property from Benjamin Williamson, Sr., and who at the time of their interconveyances were joint owners to the extent of their respective interests in the property.

In the case of Russell v. Doyle, 84 Ky. 386, 1 S. W. 604, 8 Ky. Law Rep. 366, it was specifically held that the champerty statute does not apply to a sale by one tenant in common to his cotenant of his undivided interest in land which is held adversely. The reason for this holding is well expressed in the case of Perry v. Wilson, 183 Ky. 155, 208 S. W. 776, in these words: "The purpose of the statute, which makes champertous the sale of real estate, which is held in adverse possession, is to discourage litigation, by prohibiting one, who has a doubtful title, and who is not willing to sue upon his title, from selling it to another, and thus encourage strife. Where cotenants claim under the same title, a sale by one of his interest in the land to the other does not introduce any stranger to the title, and the reason for the statute fails. He sells to one, who already has a right to sue and to base his action upon the same title."

This rule was also applied in the case of Speer v. Duff, 65 S. W. 126, 23 Ky. Law Rep. 1323, and forms the basis of the opinion of the Circuit Court of Appeals for the Sixth Circuit, construing section 211 of the Statutes in the case of Belcher Land Mortgage Co. v. Hazard Coal Corporation, 15 F. (2d) 481. The deed of Dils to Williamson, of date April 29, 1892, is not champertous

for the same reason, as Dils by that conveyance merely conveyed his one-third interest of the Phillips-Dils-Goosling patent to his cotenant Wallace J. Williamson. This leaves only the sixth deed now complained of, being that of Wallace J. Williamson to Wm. H. Lawson, trustee, of date May 24, 1894. The champerty statute is a drastic one, and a defense based upon it must be clearly established. See Mayes v. Kenton, 64 S. W. 728, 23 Ky. Law Rep. 1052. An essential element of that defense is such *actual* adverse occupancy, contemporaneous with the deed sought to be evaded by it, as would have brought to the notice of an inquirer or intending purchaser, the fact of the occupier's hostile claim, Mayes v. Kenton, supra.

If the appellees wished to avoid this deed of May 24, 1894, because of any adverse holding by Major Jim Hatfield himself, it was incumbent upon them to show that he was living at the time of the date of this deed and was then in actual adverse possession of the property in dispute. The record does not show that Major Jim Hatfield was then living. It does show that he died about the year 1894, but, the burden of proof being upon the appellees, this was not enough, and it was incumbent upon them to show clearly that Major Jim was living when the deed of May 24, 1894, was made. After Major Jim Hatfield's death, the record shows that his children had no such *actual* possession of the disputed lands as would have brought to the notice of an inquirer or intending purchaser the fact of any hostile claim on their part. His widow, in fact, in the suit brought for the cutting of the timber to which we have heretofore referred, disclaimed any title herself and acknowledged that of Lawson, trustee. Hence it is plain that she was claiming no actual possession of the land, either in herself or in her children, for otherwise the Lawson suit could not have been maintained against her, since Lawson would have had no title to support his claim. Major Jim's children were living with their mother; his widow. She had no actual possession of the disputed lands. And the record does not show that they had any actual possession of such lands.

It has been held that the character of possession necessary to obtain a title under the statute of limitations is not the same as that necessary to avoid a deed under the champerty statute. See Kentucky Union Co. v. Hevner case, supra. But, be that as it may, there is no

showing of any actual possession of these disputed lands in these infants after their father's death, and when the deed of May 24, 1894, was made. They did nothing with it. They cut no timber from it. They did not fence it in. They did not cultivate it. And no one did any of these things for them at that time—not even their mother, with whom they were living. The defense of champerty to the deed of May 24, 1894, was not made out, and hence appellant's title does not fail in this respect.

Appellee's next question is whether the appellant made out a chain of title to the disputed lands from the commonwealth to itself. The testimony of Richmond, the surveyor, when fairly read, at least in the absence of any evidence to the contrary, as was the case here, is sufficient to sustain appellant's position in that regard, under the rule laid down in the cases of Steele v. Bryant, 132 Ky. 569, 116 S. W. 755, and Cornett v. Burchfield, 142 Ky. 357, 134 S. W. 466, except as to a small acreage around Dick's Knob, which he admitted lay without the Phillips-Dils-Goosling patent. As to that acreage, appellant failed to connect up its title.

During the course of the trial the appellant sold its property, including the lands here in dispute, to the Fordson Coal Company. Pursuant to section 20 of the Civil Code, the Fordson Coal Company intervened, and asked that it be permitted to prosecute this action in the name of the Pond Creek Coal Company. This the court, by order, permitted it to do. Appellees argue that this was error, since this conveyance to the Fordson Coal Company, pending this litigation, was champertous. The contrary has been expressly decided in the cases of Chiles v. Conley's Heirs, 9 Dana, 385, Frasure v. Northern Coal & Coke Co., 189 Ky. 574, 225 S. W. 479, and White v. Pond Creek Coal Co., 201 Ky. 212, 256 S. W. 30. The procedure followed in this case was that approved in the Frasure case, supra. The case of Collins v. Adams, 167 Ky. 228, 180 S. W. 374, relied upon by the appellees, is not in conflict with these cases. There was no attempt in that case by the grantee to be allowed to prosecute the action in the name of the grantor. On the contrary, the grantor, after he had divested himself of the title, either before or after suit had been brought, it not being clear which, as the opinion says, tried to prosecute the suit himself in his own name. Of course he could not do that. But it is a far cry from such a holding to say that, by reason of it, the grantee cannot, under

section 20 of the Code, be allowed to prosecute the action in the name of his grantor.

Appellees say, however, that, as the court did not exact from the Fordson Coal Company a bond for cost, its order of substitution was void. Section 20 of the Civil Code reads: "If the right of the plaintiff be transferred or assigned during the pendency of the action, it may be continued in his name; or the court may allow the person to whom the transfer or assignment is made be substituted in the action, proper orders being made as to security for the costs."

It is in the same language as section 32 of the old Civil Code, and, in the case of Warner v. Turner, 18 B. Mon. 759, construing this section, an order of substitution under this section was upheld, although no bond for costs was exacted of the intervening assignee, as the court was satisfied as to his solvency. See, also, Dougherty v. Smith & Wilson, 4 Metc. 279. It thus appears that, if the court is satisfied as to the solvency of the assignee, he may permit him to prosecute the suit without being required to execute any bond for costs, and, as no bond was exacted here, it must be assumed, in the absence of any showing to the contrary, that the court was satisfied as to the solvency of the Fordson Coal Company. Hence, its failure to exact a bond from this coal company does not render the order of substitution void.

Under the constitutional requirement and the rules of this court, the petition for a rehearing filed herein was referred to and considered by a judge of this court other than the one who prepared the original opinion. The judge to whom the petition was referred carefully considered it and made his report to the court, as is done with cases originally referred to the members of this court. See Gaffney v. Switow, 211 Ky. 232, 277 S. W. 453. The modifications of this opinion agreed upon by the court after this report had been made to it were referred back to the writer of the original opinion for incorporation into that opinion, as it was thought by the court that he, having written the original opinion, was better fitted for that task. This explanation is here made, because the bar seems to have the idea that, when a petition for a rehearing has been filed, and thereafter modifications are written into the opinion by the judge who originally prepared it, the petition for rehearing was not considered by a judge other than the one who wrote the opinion. This idea is entirely erroneous.

The judgment of the lower court is therefore reversed, with instructions to enter a judgment quieting appellant's title to the land set out and described in its petition, with the exception of the small acreage cleared and fenced by D. J. Dotson and Mose Kinder, and the small acreage around Dick's Knob not covered by the Phillips-Dils-Goosling patent, and, as to these exceptions, the petition of the appellant must be dismissed. If the court is unable, from the proof now in the record, to correctly describe these exceptions in its judgment, it may allow further proof to be produced to show the accurate boundaries of such exceptions.